**UNITED STATES of America**

v.

**Michael LEMONAKIS, Appellant.**

**UNITED STATES of America**

v.

**Paul ENTEN, Appellant.**

**Nos. 71–1745, 71–1774.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 16, 1972.

Decided June 29, 1973.

As Amended on Denial of Rehearing Oct. 15, 1973.

Leslie Scherr, Washington, D. C., for appellant in No. 71–1745.

Julian H. Singman, Washington, D. C., with whom B. Michael Rauh, Washington, D. C., was on the brief, for appellant in No. 71–1774.

William E. Reukauf, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Harold J. Sullivan and John O'B. Clarke, Jr., Asst. U. S. Attys., were on the brief, for appellee. Raymond Banoun, Asst. U. S. Atty., also entered an appearance for appellee.

Before McGOWAN and LEVENTHAL, Circuit Judges, and WILLIAM J. JAMESON,* Senior U. S. District Judge for the District of Montana.

McGOWAN, Circuit Judge:

Appellants bring these consolidated appeals from their jury convictions, arising out of a six-week joint trial in the District Court, of all offenses with which they remained charged in what was originally a twenty-two count indictment.[1] Their contentions in this

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 294(d).

1. Appellant Lemonakis was originally charged with fifteen offenses by the indictment of January 26, 1971, subsequent-

ly reduced to fourteen pursuant to the Government's motion during trial to dismiss one of the counts, and was convicted of the remaining fourteen as follows: one count of conspiracy (18 U.S.C. § 371), five counts of burglary (22 D.C.Code §

court, taken together, concern generally: (1) rights assertedly violated by the admission into evidence of certain tape recordings, and the exclusion of other evidence presented to impeach those recordings, in the context of a joinder of defendants argued to have been improper; (2) the legality of a warrantless national security electronic surveillance to gather foreign intelligence information, and the trial court's procedures in determining it to be lawful; and (3) the sufficiency of the evidence upon which appellants were convicted. For the reasons hereinafter set forth, we affirm all convictions except those affected by the remand we require in Part IV of this opinion.

I

During a substantial part of 1969, and especially in August of that year, the Georgetown area of Washington, D.C., experienced a series of burglaries, resulting in the theft of personal property valued in excess of $250,000.00. Aside from the lucrative contents of the approximately thirty target residences, the only other feature they shared in common was that in each instance they were vacant when burglarized, the inhabitants in most cases being on vacation.

At the time of the burglaries the practice of the Seventh Precinct (now Second District, Substation One) of the Metropolitan Police Department, which was and is primarily responsible for the Georgetown area, was to maintain a "vacant house book" for area householders. Entries were made therein as residents informed the Precinct of their plans to be away. That information was transcribed on two cards, one for the Precinct file and one for the police officer designated to patrol the vicinity of the residences. Only members of the Department had access to the information. It was in part this latter limitation that led those investigating the burglaries eventually to question one James Scouloukas, a police officer who had been assigned to the Seventh Precinct for nearly nine years.[2] Although no evidence was uncovered linking Scouloukas to any illegal activity, he nevertheless resigned from the Department in December, 1969.

The police investigation for the next six months disclosed information relating solely to one of the burglaries, provided by a Georgetown antique dealer who volunteered to the police that appellant Enten had in January, 1970, shown the dealer a clock Enten had for sale which the dealer recognized as an item that had been stolen from one of his clients, Mrs. Marion Charles. On June 9, 1970, armed with this information,[3]

1801), five counts of grand larceny (22 D.C.Code § 2201), and three counts of interstate transportation of stolen property (18 U.S.C. § 2314). Appellant Enten was originally charged with twenty-two offenses, subsequently reduced to nineteen pursuant to the Government's motion during trial to dismiss three of the counts, and was convicted of the remaining nineteen as follows: one count of conspiracy, six counts of burglary, six counts of grand larceny, five counts of interstate transportation of stolen property, and one count of bringing stolen property into the District of Columbia (22 D.C.Code § 108). Six of the Enten convictions—two of grand larceny, two of burglary, and two of interstate transportation of stolen property—are to be vacated, and all but one count each of burglary and grand larceny are to be dismissed, on the remand we order for resentencing. *See* Part IV of the opinion, *infra.*

Of the two other persons charged in the same indictment, one Alfred Dolder, who testified at trial as a Government witness, pleaded guilty to one count each of this and an earlier indictment against him, and was sentenced following appellants' trial; the other, Harry Schmidt, remained a fugitive until his death on December 30, 1971. This January indictment superseded an earlier fourteen-count indictment, brought against these same four persons on October 30, 1970.

2. Scouloukas was also questioned in connection with his possible involvement in the armed robbery of Capitol Cadillac garage, an offense during which Alfred Dolder was seriously wounded and for which he was convicted in May, 1970, causing him to retire from the conspiracy with which he was charged, *supra* note 1.

3. Testimony by the police investigators at trial reveals that they had also apparently obtained information from an an-

the detective newly put in charge of the investigation of the Charles burglary on June 3, 1970, presented the matter to a grand jury. Pursuant to the grand jury's request, the detective interviewed Enten on June 11, 1970, with regard to the property in question. Enten, a successful architectural interior designer in Washington, did not make a statement, indicating his preference to consult with his attorney. That same day Enten consulted an attorney who had handled civil matters for him; later that June he first approached the attorney who was to represent him at trial. On June 19, 1970 the investigating detail met briefly with Scouloukas for the first time since the officer had resigned. It was at this point that the investigation of the Charles burglary broadened into one leading to the indictment of appellants.

On June 24, 1970 Scouloukas presented himself at the U. S. Attorney's office seeking immunity from prosecution. He was given assurances that nothing he revealed to the authorities would be used against him, whereupon he agreed to provide whatever information he had about the burglaries. On June 26, 1970 Scouloukas again met with the investigators, at which time he drove them to approximately thirty locations in the Georgetown area which he identified as having been burglarized by members of conspiracies of which he was a part; eighteen of the locations identified were named in the indictment against appellants.[4]

As of early July, 1970, the only item stolen in the burglaries which the police had recovered was a water pitcher belonging to Mrs. Charles, provided by Scouloukas himself; he also was the only person at that time to have provided information concerning the composition and operation of the conspiracy. In order to corroborate Scouloukas' statements implicating appellants, consensual electronic surveillance was undertaken of conversations Scouloukas separately initiated with each of the appellants. There were a total of ten such conversations so monitored, five involving Enten and five involving Lemonakis.

In a colloquy with the court at trial, Enten's attorney stated that a representative of his office initiated negotiations with the U. S. Attorney's office on the tenth or twelfth of July, 1970, to determine whether Enten could be granted immunity for divulging information about a portion of the stolen articles. The Scouloukas-Enten conversations were monitored on two succeeding days, July 15, 1970 (a telephone conversation successfully recorded, and a face-to-face meeting imperfectly recorded due to mechanical failure of the police receiver-recorder), and July 26, 1970 (two telephone conversations and one face-to-face meeting, all successfully recorded).

In early August, 1970, before the monitoring and successful recordation of the conversations between Scouloukas and Lemonakis took place, Lemonakis

tique dealer in New York City, who described an article shown to him by Enten which fit the description of an item stolen in the Charles burglary.

4. The Government's theory of the case respecting the burglaries adopted the view that there were two separate conspiracies formed to carry out the criminal purpose. Each conspiracy involved the same persons who planned and carried out the burglaries (Scouloukas, appellant Lemonakis, Dolder and Schmidt) ; they differed only in the person(s) selected to help dispose of the property after it was stolen. The first conspiracy employed as a "fence" appellant Enten ; he and the other co-conspirators, less Scouloukas who had been

given testimonial immunity, were indicted as stated in note 1, *supra.*

The second conspiracy, embracing burglaries of the remaining locations identified by Scouloukas, involved the same four conspirators, who used as Enten's counterparts in helping to dispose of the contraband Harold Schreiber, a New York antique dealer, and Giovanni Perelli, who acted as a go-between, both of whom appeared as Government witnesses in appellants' trial ; and Jacob Maislish and Fred Schatzmann. The members of this conspiracy, again less Scouloukas, were separately indicted on the same day (October 30, 1970) in which the superseded indictment was returned against members of the first conspiracy.

was served with a subpoena to testify before the grand jury concerning a possible conspiracy offense. This prompted Lemonakis to consult with counsel who, after the police had clandestinely taped two Scouloukas-Lemonakis telephone conversations on August 14, 1970, and one on August 15, 1970, met with the U. S. Attorney's office on August 18, 1970. The attorney was then informed that his client was a suspect in possible offenses connected with the Georgetown burglaries, whereupon he advised the Government attorneys that his client intended to invoke his Fifth Amendment privilege against self-incrimination, and would refuse to testify before the grand jury or make any statement to the Government. During that day another Scouloukas-Lemonakis conversation was taped; a final one was recorded on August 20, 1970.

Scouloukas himself testified before the grand jury on August 26, 1970. Following these and other investigative activities, the first indictments concerning the burglaries were returned on October 30, 1970.[5] The investigation continued thereafter, leading to the superseding indictment filed January 26, 1971,[6] upon which the appellants' trial was predicated. The final significant event to occur before that trial was the death by suicide of Scouloukas on June 10, 1971, just one week before the beginning of the trial in which he was to be a key Government witness.

## II

The untimely death of Scouloukas cast its shadow over the conduct of the trial and underlies a number of the claims of error, requiring as it did the Government to prosecute its case, and appellants to defend, without direct access to a central force in the conspiracy and the principal accusatory figure of the preindictment investigation. Nowhere was the effect of his absence more evident than in the Government's ability to resort to the aforementioned recordings of Scouloukas' monitored conversations with them, ruled admissible over appellants' objections, without a corresponding opportunity by appellants to challenge the contents of those recordings by cross-examination.

### A.

Both appellants raise objection to the admission of the Scouloukas-Lemonakis recordings on the ground that it denied their Sixth Amendment right to confrontation of the witnesses against them. Lemonakis complains of his inability to cross-examine [7] Scouloukas, whose statements are alleged to have been the cornerstone of the Government's case against Lemonakis. Enten complains of his inability to cross-examine both Scouloukas and Lemonakis, who invoked his Fifth Amendment privilege against self-incrimination in refusing to testify.

Lemonakis asserts that the recordings of his conversations were admitted into evidence because they contain admissions by him against his interest, an unchallenged exception to the hearsay rule. He concedes that, in order to make those contents intelligible, Scouloukas' side of the conversation also had to be admitted; he urges, however, that the meaningful evidentiary feature of the recordings is not found in his "oblique and colorable" admissions, but rather in the informer's statements. Characterizing the latter as inadmissible hearsay, he claims their introduction was prejudicial error under the Confrontation Clause. The Government, on the other hand, argues that the recordings were offered to show Lemonakis' state of mind, and not for the truth of Scouloukas' statements; consequently, Lemonakis' remarks were not hearsay at all, and those of Scoulou-

5. *See* note 4, *supra*.

6. *See* note 1, *supra*.

7. "It cannot be seriously doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

kas properly accompanied them as an inseparable guide to their meaning. Alternatively, the Government argues that, should the informant's side of the conversation be considered hearsay, to the extent that Lemonakis failed to deny or contradict Scouloukas' inculpating statements, they were properly introduced as falling within the adoptive admissions exception to the hearsay rule.

Appellants did not, in their motions made before and during trial to suppress the recordings, appear to urge upon the District Court the specific ground for objection here presented by Lemonakis when it addressed the admissibility of the recordings, nor did the trial judge on his own articulate a basis for the introduction of Scouloukas' side of the recorded conversations now asserted to be inadmissible hearsay.[8] We treat the objection as having been properly raised for purposes of this appeal, but we think the absence of this specific argument to the trial judge during his deliberations

on this subject is a factor to be considered in the court's failure to provide those actions that might have minimized the prejudicial effect of the recordings.

■ Although the objection raised is one of first impression for this court, and there appears to be only one reported case that has dealt with this precise issue, State v. Spica, 389 S.W.2d 35, 47–48 (S.Ct.Mo.1965), cert. denied, 383 U. S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966), we agree with the result reached there. It would appear that the recordings here would be admissible as "a reciprocal and integrated utterance between the two" parties. United States v. Metcalf, 430 F.2d 1197, 1199 (8th Cir. 1970). Scouloukas' statements would accompany those of Lemonakis not as evidence of the truth of the former's contents but, to the extent to which the appellant's responses constituted incriminating admissions of his own, to make those responses intelligible to the jury and recognizable as admissions.[9] That

8. Of three motions to suppress the recordings made prior to trial and Scouloukas' suicide, Lemonakis early relied upon statutory grounds and later followed Enten's assertion of a violation of his right to counsel. At trial and after the suicide their motion was orally renewed and discussed on five separate days by counsel for Enten, who asserted as new grounds (1) inaudibility of a portion of the recordings, (2) use of testimony from agents who monitored the conversations, and (3) provision to the jury of transcripts of the recordings. Scouloukas' unavailability was relied upon only to the extent that counsel asserted "a great deal of hearsay testimony from Scouloukas telling the [monitors] what actually went on" would likely appear in their testimony. The opinion then rendered denying the renewed motion thus mentions Scouloukas' death in this context, and permits the monitors' testimony principally by reference to United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Counsel for Lemonakis referred to the recordings and Scouloukas' hearsay only to support the introduction of both certain hearsay testimony by a Government witness, and the suicide note discussed infra. The court's agreement with the Government at the latter colloquy, again by reference to White, that Scouloukas' statements as

presented by the monitors were not hearsay, accords with the issue addressed in its opinion. In sum, Lemonakis' present concern with the possibility Scouloukas' remarks were used to prove their content was not urged upon the trial judge in his consideration of their admissibility, but only in the attempt to introduce other hearsay evidence for the defense. This is consistent with both the statement to the jury in his behalf, made prior to the introduction of the recordings, that they contain nothing of any probative value concerning him, and the absence of this concern in his motion for a new trial, where he again relied on a right to counsel violation as well as the Fifth Amendment in objecting to the introduction of the recordings.

9. Indeed, counsel for appellant Lemonakis conceded at trial that his client's recorded remarks would be meaningless without Scouloukas' remarks. Recorded conversations have been admitted in other contexts where the contents of the recordings were offered to establish matters other than their truth. See, e. g., People v. Feld, 305 N.Y. 322, 113 N.E.2d 440, 443 (1953) (despite implication of defendant, recordings admitted to show prior consistent statements of Government witnesses whose credibility defendant at-

the statements were made is all that is important, and the recordings themselves suffice to establish that. The right to cross-examine the absent informant under oath, to test his recollection, prove his motives, and permit the jury to consider his demeanor is therefore inapplicable, and hearsay considerations do not operate as a bar to admissibility. United States v. Castro, 438 F.2d 468, 473 (7th Cir.), cert. denied, 402 U.S. 977, 91 S.Ct. 1681, 29 L.Ed.2d 142 (1971).

The only incriminating statements of the informant to be taken as true are those which, in the judgment of the jury, were adopted by appellant, and while that does make the informant's statements hearsay evidence, their adoption by the appellant brings them within a long-recognized hearsay exception.[10] Sparf v. United States, 156 U.S. 51, 56, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Insofar as hearsay considerations do operate here, we cannot say that the exclusionary principles embodied in the Confrontation Clause nullify the well-established reasons for making such admissions exceptions to the hearsay rule. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L. Ed.2d 213 (1970); California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

The trial judge should customarily hear the recordings out of the presence of the jury in order to rule on objections raised to their admissibility. Monroe v. United States, 98 U.S.App.D. C. 228, 234 F.2d 49, 55 (1956); Brewer

v. State, 414 P.2d 559, 563 (Okl.1966). And, where the objection raised concerns the prejudicial aspects of the absent participant's side of the conversation, it is for the trial judge to determine whether the probative value of the recordings outweighs their assertedly prejudicial effect,[11] keeping in mind his discretionary power to delete objectionable portions where appropriate. Delli Paoli v. United States, 352 U.S. 232, 237, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); People v. Hines, 61 Cal.2d 164, 390 P.2d 398, 405, 37 Cal.Rptr. 622 (S.Ct.Cal. 1964 *en banc*) (Tobriner, J.). In addition, whether the absent participant's remarks are admitted to make the recordings intelligible or as adoptive admissions, normal procedure would dictate issuance of instructions to the jury to insure consideration of the evidence consistent with the limited basis for its introduction. *See e.g.*, People v. Davis, 43 Cal.2d 661, 276 P.2d 801, 806 (S.Ct. Cal.1954 *en banc*).

The record reveals that the trial judge and both appellants studied the contents of the recordings at issue prior to their introduction; that limiting instructions as requested by appellant Enten were issued; and that certain requests for deletions by both appellants were in part granted. Appellant Lemonakis' failure at trial to request such mitigating action, in light of other objections raised and carefully accommodated by the trial judge, itself suggests the minimal likelihood of undue prejudice created by the recordings; and our own

---

tacked); State v. Meyer, 37 Wash.2d 759, 226 P.2d 204, 209 (1951) (despite implication of defendants, transcription of recording admitted to show rape victim mentally incapable of consenting to sexual intercourse).

10. The proposed Rules of Evidence for United States Courts and Magistrates which the Supreme Court, Douglas, J., dissenting, recently authorized the Chief Justice to transmit to the Congress, reported with advisory committee notes at 56 F.R.D. 183 (1973) (hereinafter Pro-

posed Rules), provide in Rule 801(d)(2) (B) that:

A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement of which he has manifested his adoption or belief in its truth. . . .

*See also* 4 Wigmore, Evidence §§ 1069–75 (Chadbourn rev. 1972).

11. The Proposed Rules, *supra* note 10, provide in Rule 403 that:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . .

examination bears that out. In this light, we do not believe the introduction of the recordings to have been error; and indeed had we conceived it to be error given the absence of limiting instructions or deletions, in view of the analysis presented below in connection with the exclusion of Scouloukas' suicide note [12] that error would not in any event appear to require reversal.

■ Objection to the introduction of the Scouloukas-Lemonakis recordings is also raised by appellant Enten, on the ground that they contained repeated and likely incriminating references to him which he was unable to clarify by cross-examination due to Scouloukas' death and Lemonakis' refusal to testify, denying to him his rights secured by the Confrontation Clause. He relies principally on Bruton v. United States, 391 U. S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), holding that the admission of the confession of petitioner's co-defendant, which implicated petitioner, denied the latter's right to confrontation despite the trial court's instructions to the jury that the confession could be used only against the co-defendant. Enten's position is quite different from that of petitioner in Bruton, and we reject his claim under the Sixth Amendment.

As Enten appears to suggest in his brief, the recordings reveal no evidence that he knowingly agreed to carry out the unlawful objectives of the conspiracy. Rather, the references to his involvement were not inconsistent with the view that Enten innocently received the stolen merchandise,[13] the argument most forcefully pressed in the closing statement by Enten's counsel. Neither were they contained in a formal confession as they were in Bruton, and thus, to the extent they may have been taken as inculpatory, were less likely to be believed by the jury—especially since the jury knew Scouloukas to be dishonest and motivated as an informant. The references to Enten were therefore not the "powerfully incriminating extrajudicial statements of a codefendant" present in Bruton, 391 U.S. at 135, 88 S.Ct. at 1627.

■ Additionally, in response to Enten's request, the trial judge did instruct

12. See Part II(c) infra. Our discussion there (1) accords the trial judge a broad discretion in the admission of evidence in the unique circumstances of this case, (2) establishes the relatively minimal inculpatory impact of the Scouloukas-Lemonakis recordings, (3) sets forth the further weakening of that impact by Lemonakis' efforts to impeach the absent Scouloukas, and (4) stresses as most important and illustrates the substantial independent evidence introduced not just in respect of the matters to which the recordings may be said to attest, but also regarding Lemonakis' guilt of the other offenses charged.

13. As an example, the conversation recorded on August 20, 1970 contains the following colloquy:

LEMONAKIS: Well, how did your boy Paul get busted?

  \*     \*     \*     \*     \*

SCOULOUKAS: He told me he took a piece of jewelry down to the pawn shop; the antique dealer recognized it. [He called the police].

  \*     \*     \*     \*     \*

SCOULOUKAS: Now this is the story he tells me, he tells me that he told them . . . he got another piece resembling the piece he took down there and that's his cover, the stuff that came out of the big yellow house. Remember the big yellow house up on the hill?

Disregarding the jury's continuing knowledge of Scouloukas' attempt to elicit admissions and his disregard of the truth in doing so, as testimony revealed he had also done in making statements to the police; and even assuming "your boy Paul" refers to appellant; nevertheless Enten's asserted possession of a stolen piece of jewelry in no way implies he received the jewelry knowing it was stolen. Nor does it suggest Lemonakis' own belief that Enten had guilty knowledge since the jury knew from previous recordings that Lemonakis' reference to Enten was derived from information he had earlier gotten from Scouloukas. At oral argument counsel for appellant Enten appeared to concede these points, but maintained that the references to Enten were still unacceptably prejudicial. Under either claim we adhere to the analysis that follows.

the jury that the Scouloukas-Lemonakis recordings were not admissible against Enten for any purpose, and repeated these instructions twice more during the trial. As the Court in *Bruton* said, "[i]t is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions," 391 U.S. at 135, 88 S.Ct. at 1627. Where, as here, the challenged references are incorporated in a statement of comparatively less credibility and are of questionable inculpatory impact in any event; and where, as here, there is important independent incriminating evidence against the challenging party,[14] we conclude that the limiting instructions as issued were sufficient to preserve the fair trial that *Bruton's* invocation of the Confrontation Clause was designed to protect. Insofar as the introduction of the challenged recordings may constitute a technical violation of the *Bruton* rule, we find their use to be harmless beyond a reasonable doubt under the standard set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See, e.g.* Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

■ In connection with the assertedly improper admission of the Scouloukas-Lemonakis recordings, Enten additionally contends that their impact, when added to the testimony of certain Government witnesses against Lemonakis, resulted in a joinder that was so prejudicial to him that the failure of the trial court to grant his pretrial motion for severance, and motions made during trial for severance and mistrial, was error. We have discussed the minimal weight likely to be accorded these recordings with respect to Enten, and our examination of the record reveals no prejudice worthy of consideration to have accrued from the witnesses' testimony.[15] The action of the trial judge was fully in accord with the broad discretion that was his to exercise under Rule 14, Fed.R.Crim.P.,[16] United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317, 1334 (1971), cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 669 (1972); United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148, 1159 (1971), particularly in view of the interests of judicial administration and economy served by a joint trial in a case of this magnitude. *See, e.g.,* United States v. Robinson, 139 U.S.App.D.C. 286, 432 F.2d 1348, 1351 (1970).

■ Prejudice from joinder of defendants may also arise when those defendants present conflicting and irreconcilable defenses. *Robinson, supra,* 432 F.2d at 1351; Rhone v. United States, 125 U.S.App.D.C. 27, 365 F.2d 980, 981 (1966). When this situation occurs, and one of the defendants exercises his right not to testify, the other defendant loses the opportunity to cross-examine the former with respect to his conflicting defense. To compensate for his inability to confront his antagonistic co-defendant, the other defendant may seek

---

14. We refer particularly to the damaging admissions made by appellant Enten as they appear in the monitored Scouloukas-Enten conversations, which include Enten's offer to Scouloukas for the latter to plead guilty to the offenses being investigated, leaving Enten, as the more capable of the two, free to pursue professional success and share the financial rewards with Scouloukas once the latter's imprisonment terminated. *And see* notes 35 and 36 *infra*.

15. As concerns the potentially most damaging testimony, Enten's counsel acquiesced to its introduction and expressed reliance on prophylactic instructions. His counsel's objection to the potentially harmful introduction of another witness' testimony was sustained; and, in addition to only equivocal and brief references to one the jury might have believed was Enten, the final two witnesses whose testimony is complained of stated at trial that they knew only appellant Lemonakis, not Enten.

16. We note in this regard the care the trial judge exercised in following, with respect to Enten's pretrial motion, the suggestion of the 1966 Amendment to the Rule that proposed evidence be inspected *in camera* prior to a ruling on such a motion. *See Bruton, supra,* 391 U.S. at 131–132, 88 S.Ct. 1820.

to ask the jury to draw an adverse inference from his co-defendant's failure to take the stand and contradict his version of the matter. Holding that this dilemma pits the right to silence without prejudicial comment thereon by a co-defendant's attorney, derived from the Fifth Amendment privilege against self-incrimination, against the right to comment upon such silence when integral to the defense, derived from the Sixth Amendment right to confrontation, the court in DeLuna v. United States, 308 F.2d 140 (5th Cir. 1962), reconciled the two by requiring separate trials of the opposing defendants. Subsequent cases have held that a critical ingredient for the invocation of the De-Luna rule is the presence of counsel's duty to comment, which in turn exists only when the defenses raised are truly antagonistic.[17] See, e.g., Gurleski v. United States, 405 F.2d 253, 265 (5th Cir. 1968), cert. denied, 395 U.S. 981, 81 S.Ct. 2140, 23 L.Ed.2d 769 (1969) ; cf. Hayes v. United States, 329 F.2d 209, 222 (8th Cir.), cert. denied, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964).

To the extent that Enten makes the argument that his defense was sufficiently antagonistic to that of Lemonak-

is to warrant severance, he is mistaken.[18] He contends, alternatively, that denial of his motion to comment on Lemonakis' failure to testify deprived him of his right to a fair trial, and cites the opinion of this court in Hines, supra, 455 F.2d 1317, to support this view. Hines allowed a defendant's attorney to ask the jury to draw a favorable inference from his client's willingness to take the stand, where the co-defendant failed to testify and where severance was properly denied, since the defenses presented were not conflicting in the DeLuna sense. Id., at 1334–1335.

We do not read DeLuna and Hines together to say that, if severance is denied because defendants' arguments are not mutually exclusive, then that fact permits a defendant to comment on his co-defendant's failure to testify. As the antagonism of the respective arguments lessens, the duty to comment correspondingly diminishes—but the right not to testify without prejudicial comment thereon is not so proportionately diluted. Although Hines allowed comment, it nevertheless preserved the latter right in substantial part. While noting that DeLuna involved a "more serious trespass on the accused's Fifth Amendment rights" due to the inconsist-

---

17. Such defenses are best exemplified by DeLuna itself. There the defendant who was erroneously permitted at trial to comment on his co-defendant's (DeLuna) failure to testify attempted to put full blame for the narcotics offense at issue on De-Luna, contending the latter was the only person who knew narcotics were contained in the package both had handled.

18. To illustrate this asserted antagonism, Enten points to what he sees as comparatively much stronger evidence linking Lemonakis to the conspiracy; and to Lemonakis' asserted antagonism toward Enten as demonstrated by the Lemonakis-Scouloukas recordings. Neither feature, accepted arguendo as true, results in the kind of inconsistency necessary to raise the dilemma present in DeLuna. Indeed, the principal argument in Enten's defense was that the Government failed to prove that Enten received the stolen property with knowledge of its stolen character. It was urged that such a failure would

remove Enten from his membership in the conspiracy as charged and thereby exonerate him from all other crimes for which he was indicted. This defense does not point the finger of guilt at Lemonakis since Enten claims he received the stolen property from Scouloukas, not from his co-defendant. Enten's defense does not therefore result in such a conflict with Lemonakis' basic position (that he did not steal the property in question) that the jury would unjustifiably infer both were guilty. Robinson, supra, 432 F.2d at 1351. Nor does it result in Enten's need to comment on Lemonakis' silence such that a comment would be "integral" to Enten's defense. DeLuna, supra, 308 F. 2d at 143. Finally, the disparity of evidence was not so damaging that an impermissible risk of transference of guilt to Enten was present. McHale v. United States, 130 U.S.App.D.C. 163, 398 F.2d 757, cert. denied, 393 U.S. 985, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968).

ent defenses there presented, 455 F.2d at 1334, *Hines* also focused on another factor not present here. Attention was drawn to appellant Hines' silence only indirectly at most, for the comment by his co-defendant's attorney addressed solely the co-defendant's own willingness to testify. On these facts, *Hines* held an immediate cautionary instruction to be an adequate remedy short of severance. Permitting Enten's attorney to comment directly on Lemonakis' silence would have resulted in the imposition of too great a penalty on Lemonakis' exercise of his Fifth Amendment right not to give testimony, even if cautionary instructions would have been given. The District Court did not therefore abuse its discretion in denying Enten's various related motions for mistrial, severance, and permission to comment.[18a]

### B.

█ Apart from their separate objections stemming from the introduction of only the Scouloukas-Lemonakis recordings, appellants jointly claim the admission of both the Scouloukas-Lemonakis and Scouloukas-Enten recordings denied their Sixth Amendment right to counsel, placing primary reliance on Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Their argument is, essentially, that *Escobedo* (right to counsel attaches at pre-indictment stage in custodial interrogation setting) and *Massiah* (right to counsel attaches at post-indictment stage in electronic surveil-

lance setting), when read together, establish that the recording of the pre-indictment electronic surveillance of appellants outside the presence of their counsel required exclusion of those recordings at trial.

Appellants concede that our decision in Wallace v. United States, 134 U.S. App.D.C. 50, 412 F.2d 1097 (1969) is basically contrary to their claim. There we held that:

> The Sixth Amendment does not forbid the securing of admissions by undercover tactics from a subject prior to arrest or indictment. . . . The right to counsel has been extended to phases of an investigation prior to arrest or formal charge only when the suspect was in custodial circumstances. 412 F.2d at 1101.

We are urged, however, to reconsider our definition of the critical stage of the prosecutorial process at which the right to counsel is engaged. In support of their position appellants cite United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), which they assert is significant for its failure to suggest that pre-indictment identification procedures be treated any differently from those post-indictment, while holding the latter to be such a "critical stage."

█ The answer to this contention, and appellants' claim generally, is provided by the recent Supreme Court decision in Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), where the Court was asked to extend *Wade* to a police station show-up that

18a. Appellant Enten alone, and for the first time on appeal, complains of the fact that the tapes given to the jury at its request during its deliberations contained conversations in addition to those which had been admitted into evidence. The record shows, however, that the parties were aware of this fact at the time, and, at the suggestion of both defense counsel, the judge instructed the jury to listen only to those portions of the tapes which had been in evidence. This was feasible for the jury to do because the prosecution had prepared a memorandum

from which the jury could tell from the markings on the tapes the areas that involved conversations not in evidence; this memorandum was given to the jury and the jury was fully instructed in open court as to how to operate the tape recorder. Under these circumstances there is reasonable ground for belief that the 12 jurors would not deliberately, in each other's presence, disregard such an instruction; and this was presumably why trial counsel for both appellants professed themselves completely satisfied with this means of handling the matter.

took place before indictment or other formal charge of the petitioner. In refusing to so extend the guarantee of the right to counsel, the Court considered its prior cases construing that guarantee and concluded that, with one exception, all of those cases involved a point of time at or after the initiation of adversary judicial criminal proceeding.

> It is this point . . . that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

406 U.S. at 690, 92 S.Ct. at 1882. The exception noted was *Escobedo, supra,* which the Court distinguished as having been limited to its own facts, and in any event correctly characterized as primarily conceived " 'to guarantee the full effectuation of the privilege against self-incrimination.' " Johnson v. New Jersey, 384 U.S. 719, 729, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882 (1966). Appellants' claim of constitutional error, insofar as it rests upon the Sixth Amendment guarantee of the right to counsel, is therefore without support despite the facts, set forth below, upon which they rely.

■■■ Both appellants stress that, prior to commencement of at least part

of the electronic surveillance of their conversations with Scouloukas, their respective attorneys had made their representation known to the investigating authorities who directed the surveillance; and, indeed, that Lemonakis' attorney had informed those authorities that Lemonakis would make no statement regarding the investigation. Furthermore, they set store upon the investigative activities conducted prior to the surveillance in that they claim those activities produced a legally significant "focus" upon each as a key suspect in the burglaries.[19] *See Escobedo, supra,* 378 U.S. at 490, 84 S.Ct. 1758. In view of the preceding analysis, we find these facts to be of no redeeming effect on the invalidity of their Sixth Amendment claim. The Government's prior knowledge that subjects of pre-indictment surreptitious surveillance have retained counsel and are advised not to respond to investigative inquiries, and prior investigation of those suspects short of formal institution of criminal proceedings, do not operate to convert that surveillance into a "critical stage" within the meaning of *Kirby.*[20]

■■■ An additional claim made by appellants arising out of the Government's knowledge, prior to undertaking the consensual electronic surveillance,

19. As set forth earlier in the text, those activities were the questioning of Enten by the police pursuant to the grand jury's request, and the issuance of the subpoena to Lemonakis to testify before the grand jury concerning a possible conspiracy offense. It should be noted, however, that Scouloukas himself did not testify before the grand jury until August 26, 1970—six days *after* the last recorded surveillance.

20. Appellants suggested at oral argument, though not in their briefs, the applicability of the Fifth Amendment privilege against self-incrimination to this challenge of the recordings. *Kirby, supra,* decided after submission of the briefs in this case, appears to suggest that aspect as the only substantial one of continuing viability present in *Escobedo, supra,* upon which case appellants placed heavy reliance. In this respect, we note that *Johnson, supra,* emphasizes that the Fifth Amendment facet of *Escobedo* (and Miranda v. Ari-

zona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966)) is directed toward insuring, by the provision of the right to counsel in custodial interrogations, that suspects have an intelligent understanding of their rights whether coercion is overt and obvious, or otherwise. Absent that necessary element of compulsion, which is the case in the type of surveillance at issue, neither the Government's prior knowledge of the representation of appellants, nor the prior investigative activities involving appellants as suspects, engages the right to counsel to insure effectuation of the Fifth Amendment privilege. *See, e. g.,* Hoffa v. United States, 385 U.S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As we stated in *Wallace,* applicable with equal force in this context:

> No danger of coercion compels police officers and courts to pick a peril-point in an investigation at which the right to counsel attaches to bar further undercover investigation.

412 F.2d 1101.

that both had retained counsel, is that the U. S. Attorneys who proceeded with the surveillance deliberately breached their ethical responsibilities by attempting to pierce those pre-established attorney-client relationships. It is asserted that such a breach would require the suppression of evidence so obtained. The claim presents a somewhat novel question for this court.[21] Although the Government did not respond to the argument in its brief, we nevertheless find the actions of the U. S. Attorneys to be consistent with the current ethical standards demanded of the legal profession.

■■■■■ The "communication" between an attorney and an adverse party who has retained counsel, without the latter attorney's consent or authority of law—proscribed by the American Bar Association's Code of Professional Responsibility [22]—does not in our view embrace the initiation and recording of the conversations between Scouloukas and appellants.[23] As the Second Circuit stated in considering this issue under similar factual circumstances,

> Assuming [under Canon 9—the predecessor to the provisions of the Code under which appellants claim] that it would be improper for a prosecutor to interview a criminal defendant under indictment in the absence of his retained counsel . . . such a prohibition would not require that govern-

---

21. Although we have had occasion to comment on a prosecuting attorney's action in light of his ethical responsibilities, none of those cases presented the extension of such responsibility here urged. Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964, 970 n.18 (1964) (in-custody, post-arrest police interrogation of suspect who had not retained counsel); Mathies v. United States, 126 U.S.App.D.C. 98, 374 F.2d 312, 316 (1967) (in-custody, post-arrest police interrogation of suspect without notifying his retained counsel). The factual circumstances present in these cases reveal their constitutional dimension, in terms of Fifth and Sixth Amendment guarantees relating to the right to counsel, which does not, as we have concluded, inhere in the instant case.

22. ABA Code of Professional Responsibility (1970) provides under Canon 7 the Ethical Consideration that, in part,

> [t]he legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not *communicate on the subject matter of the representation* of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has the consent of the lawyer for that person. . . . EC 7–18. (Emphasis added, footnote omitted);

and the Disciplinary Rule that, in part,

> [d]uring the course of his representation of a client a lawyer shall not:
> Communicate or cause another to *communicate on the subject of the representation* with a party he knows to be represented by a lawyer in that matter

unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so. . . . DR 7–104. (Emphasis added, footnote omitted).

23. A review of the cases and materials that have noted objection to a prosecuting attorney's "communication" with a suspect without notifying the lawyer who represents him illustrates that, with the exception of the lower court case in *Massiah* as quoted in the text to follow, that "communication" has been in the form of custodial or post-indictment questioning of a criminal suspect by the Government's attorney, law enforcement officer, or retained psychiatrist. All involve undisguised Government inquiries pressed by official members of the prosecutorial effort at a point in time when their questions would be sharpened by the factual posture of the case against the suspect. United States v. Carlson, 423 F.2d 431, 440–443 (9th Cir. 1970); United States v. Four Star, 428 F.2d 1406 (9th Cir. 1970); Schantz v. Eyman, 418 F.2d 11, 13 (9th Cir. 1969); Coughlan v. United States, 391 F.2d 371, 376–378 (9th Cir. 1968) (Hamley, J., dissenting); United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967); *Mathies, supra* note 21; Lee v. United States, 322 F.2d 770, 777 (5th Cir. 1963); United States v. Ferguson, 243 F.Supp. 237 (D.D.C.1965); *Ricks, supra* note 21; Note V, Criminal Law and Procedure, 20 Hastings L.J. 949, 958 (1969); Recent Development, 1968 Duke L.J. 816, 821–22; Broeder, Wong Sun v. United States: A Study in Faith and Hope, 42 Neb.L.Rev. 483, 601–604 (1963); Drinker, Legal Ethics 201–03 (1953).

ment investigatory agenies also refrain from any contact with a criminal defendant not in custody simply because he had retained counsel. To be sure, such a rule would prohibit an investigator's acting as the prosecuting attorney's alter ego, but the [police officer here did not so act, and] the contact [was further removed from the attorney in that it was] with a co-defendant whose instructions from the investigator were apparently no more than to induce Massiah to talk. This was not a case where a defendant was in danger of being tricked by a lawyer's artfully contrived questions into giving his case away. United States v. Massiah, 307 F.2d 62, 66 (2d Cir. 1962) (Lumbard, C. J.), rev'd on other grounds, 377 U. S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

Similarly here, in a non-custodial situation, the Government's instructions to its informant, although provided by a U. S. Attorney as well as the investigating officers, were not such as to constitute Scouloukas the "alter ego" of the U. S. Attorney's office. Moreover, the *Massiah* surveillance was undertaken after the indictment of the suspect. Here, in the investigatory stage of the case, the contours of the "subject matter of the representation" by appellants' attorneys, concerning which the code bars "communication," were less certain and thus even less susceptible to the damage of "artful" legal questions the Code provisions appear designed in part to avoid. Finally, we cannot say that at this stage of the Government's investigation of a criminal matter, the public interest does not—as opposed to the different interests involved in civil matters—permit advantage to be legally and ethically taken of

a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.

*Hoffa, supra,* 385 U.S. at 302, 87 S.Ct. at 413. *See also* United States v. White, 401 U.S. 745, 752, 91 S.Ct. 1122 (1971). We find there was no ethical breach by the U.S. Attorneys prosecuting the case; accordingly, we need not reach what legal consequences might flow had we concluded otherwise.

### C.

Appellant Lemonakis raises a final objection based upon Scouloukas' unavailability at trial, one directly linked to the latter's suicide on Thursday, June 10, 1971. Preceding that event by what appears to be less than a week, Scouloukas prepared a handwritten suicide note bearing the notation noon, Friday, addressed to the woman with whom he had been having an extramarital affair for a number of years. In relevant part the note expressed his remorse with respect to his treatment of his wife and children, guilt feelings about leaving them, and conflicting emotions concerning the addressee of the note; and contained the following statement:

> As far as [the U. S. Attorneys prosecuting the case] go—Mike Lemonakis had nothing to do with any robberies that I know of. I lied to them about Mike because even he hurt me with my family. But he is innocent.

Counsel for Lemonakis attempted to introduce this note as exculpatory evidence at trial, but the court excluded it as hearsay.

Lemonakis' primary claim of error with respect to this ruling, which he argues without citation to authority was reversible error, is that despite its hearsay nature,[24] denying him

24. In addition to his basic claim in this regard, Lemonakis also urges that the suicide note was impressed with sufficient indicia of reliability to qualify it as an exception to the hearsay rule. Whether taken as a separate ground for reversal or supportive of the due process claim to follow above, we do not agree. Insofar as appellant relies on the expanded nature of the exception relating to dying declarations found in Rule 804(b)(3), Proposed Rules, *supra* note 10, we note first that

the opportunity to use the suicide note deprived him of that fundamental fairness which the law seeks to preserve in the administration of criminal justice. Under the duty which is ours to examine the totality of circumstances in appraising such a claim of denial of due process of law, Malinsky v. New York, 324 U.S. 401, 416, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), we find from our review of the 4000-page record in this case that although we conceive the exclusion of the note to have been error, we do not think it requires reversal.

Central to Lemonakis' claim is the admission of the Scouloukas-Lemonakis tape recordings. Since appellant had no opportunity to cross-examine Scouloukas regarding the latter's recorded statements, which appellant asserts to be inadmissible hearsay and inculpatory as well, the note stands—in appellant's view—as the only meaningful source of impeachment of Scouloukas' credibility. Since the Government was permitted the use of Scouloukas' inculpatory hearsay, his argument runs, fairness demands he be able to employ exculpatory hearsay to show Scouloukas' motives to implicate him falsely.

We earlier were able to sustain the admission of the Scouloukas-Lemonakis recordings, especially where the trial court was not asked to accommodate the hearsay objection raised here. But their introduction would appear permissible such failure notwithstanding, on the more fundamental ground that, in the unique situation presented to the court by Scouloukas' suicide and resultant elimination of a critical part of the Government's case, the trial judge had the power to serve the ends of justice by admitting recordings made with the consent of the unavailable witness. Protection of Lemonakis from the hearsay dangers of Scouloukas' unconfronted recorded statements would in part have been provided by Lemonakis' own opportunity during these conversations to have refuted any implication of him by Scouloukas, and in part by appropriate deletions and/or limiting instructions by the trial judge to minimize any potential prejudice perceived by the defense. Another important element of such protection was not, however, provided Lemonakis.

Irrespective of the theory of their admissibility, once the recordings were introduced in support of the Government's case, we believe it error for the trial judge to have considered only the technical hearsay grounds he did in determining the admissibility of the suicide note. The admission of Scouloukas' statements on the recordings, coupled with his unavailability at trial, was argued to the court by both appellants as grounds for admission of the note. Again in the unique circumstances of this case and apart from technical hearsay rules, fairness to both sides in our view required the jury to be presented with information favorable to the defense the reliability of which, like that favorable to the Government, had to be established without access to the source of the information. As the defense had opportunities short of cross-examination to impeach Scouloukas as the maker of the recorded statements, so too would the Government have been able similarly to impeach him as the maker of the note.

this claim would not appear available to him on appeal in view of the fact that he expressly denied its application three times at trial. Apart from that, the note was clearly not made with the belief that death was imminent, nor did it concern the cause or circumstances of what was believed to be impending death, both of which the Rule continues to require. 56 F.R.D. at 321, 326. And, if taken as a declaration against Scouloukas' penal interest—an interest of no moment to a dead man—Rule 804(b)(4) expressly requires corroboration not present here before such an exculpatory statement may be admissible. Finally, we cannot believe Scouloukas' interest against exposure to hatred, ridicule or disgrace, even if translated to his surviving family, is sufficient to meet the intent of that exception in Rule 804(b)(4).

Having said that, we nevertheless hold the exclusion of the note to be harmless for the reasons that (1) the probative value of the recordings was of a limited nature, their effect on the jury thereby capable of being offset by (2) Lemonakis' impeachment, without use of the note, of whatever part of Scouloukas' recorded statements were taken by the jury as true and implicating him, both reasons to be considered in light of (3) the substantial independent evidence of Lemonakis' guilt introduced by the Government.

First, the recordings were clearly not, as Lemonakis contends here, "the keystone of the government's case against" him. They rather, as was argued to the jury on his behalf, contained essentially no evidence connecting Lemonakis with any of the homes he was charged with burglarizing or any contraband from those homes. This perhaps explains the absence of argument to the trial court, in connection with its consideration of the admissibility of the recordings, that Scouloukas' statements were prejudicial hearsay requiring, if not exclusion, at least mitigating action by the court. *See, e. g.*, Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150, 154 (1967).

The indictment charged Lemonakis with conspiracy, burglary and grand larceny of five homes, and interstate transportation of stolen property from three of those homes. The five recorded Scouloukas-Lemonakis conversations introduced at trial make no mention of any specific act of illegal entry, theft, or subsequent handling of contraband.[25] Their inculpatory impact related, then, only to the conspiracy charge, and only to the extent that (1) Lemonakis' acknowledgment of such as his acquaint-

anceship with other members of the alleged conspiracy, and concern over the progress of the grand jury investigation and the possibility of the conversations being overheard by the authorities, and (2) Scouloukas' statements that certain alleged conspirators (Enten and Dolder) appeared to be implicating him and Lemonakis, that they should meet with the final conspirator (Schmidt) to plan their response to the investigation, and that perhaps they should "scatter," were believed by the jury to suggest Lemonakis' criminal involvement with the others charged with conspiracy.

Second, Lemonakis' assertion that he had no meaningful opportunity without the suicide note to challenge Scouloukas' credibility in respect to those latter statements is unfounded. We have adverted to the testimony which revealed Scouloukas to be untruthful on occasion, and this possibility was increased, at least in terms of argument, since the jury also knew he was a Government informant who had sought immunity in return for his cooperation in assisting the investigation of the burglaries, and who had indeed resorted to falsehood to increase the utility of that cooperation. *See* note 13 *supra*.

But an even more useful feature of the case in this regard arises from the family relationships between Lemonakis and Scouloukas. Not only were the two men cousins who together grew up, went through military service, and entered a joint business venture—their wives were sisters. Testimony presented in Lemonakis' defense revealed that, during Scouloukas' stormy relationship with his wife, Mrs. Scouloukas relied on appellant Lemonakis and his wife for support, to the extent that she moved from her home in Virginia to live for a year with

25. Only twice did the conversations even generally refer to illegal acts charged, and both times Lemonakis negated his involvement. In the conversation referred to in note 13, *supra*, Scouloukas, making reference to the "stuff' from the big yellow house which he said was property the police thought Enten had, asked Lemonakis if he remembered "the big yellow house up on the hill" (presumably the Charles house). Lemonakis replied "I don't know. . . ." Earlier in the same conversation, Scouloukas asked whether Lemonakis remembered "The first load of stuff that we took out, me, you and Dolder." Lemonakis replied: "What the hell do I know."

Lemonakis' family in Pennsylvania when Scouloukas was most heavily involved with the woman to whom he addressed the suicide note. At that time Mrs. Scouloukas retained a Pennsylvania attorney to represent her in various matters of domestic relations, particularly in regard to Scouloukas' attempts to obtain a divorce. That attorney was also brought forth to testify for the defense, and he revealed that Scouloukas blamed Lemonakis for Scouloukas' inability to force his wife to grant him a divorce by use of economic pressure. The attorney testified that, due to these feelings, Scouloukas told him in June, 1970—the same month Scouloukas sought immunity from prosecution—that he was going to "get" Lemonakis "if it was the last thing he did."

Prior to presenting the above testimony, counsel for Lemonakis was allowed to summarize for the jury that he was about to present evidence that would reveal Scouloukas' motives for implicating Lemonakis. Furthermore, in his closing argument to the jury Lemonakis' counsel consistently and forcefully characterized Scouloukas as untrustworthy, emphasizing his involvement in the robberies as a turncoat policeman, the Government's direction to "go get" Lemon-

akis during their monitored conversations, and Scouloukas' vindictiveness toward Lemonakis arising out of the family relationship just described. There were, therefore, meaningful alternatives open to Lemonakis short of the suicide note, which he followed, permitting impeachment of Scouloukas' recorded statements to him.

Lastly, and most significant, the Government presented independent evidence of sufficient probative force to render harmless Lemonakis' inability to employ the suicide note.[26] As important general background of the operation of the conspiracy, it was established that each of the homes mentioned in the indictment was one in the Georgetown vicinity whose owner was absent at the time of its burglary, having notified the Seventh Precinct of his absence. Scouloukas, the first of the four alleged operative conspirators, thus would have known of the vacancy by access to the aforementioned "vacant house book."

It was further established that the second such conspirator, Schmidt, who also did not testify at trial, *see* note 1 *supra*, provided a storage place for the contraband at his Maryland apartment. Appellant Enten testified that he obtained stolen property from that apart-

26. In so holding we do not ignore three other factors that appeared to concern the trial judge as militating against introduction of the note. First, as we suggested above, had the note been admitted the Government would have been able to challenge its trustworthiness, specifically by the introduction of a conversation Scouloukas had shortly before committing suicide with the same woman to whom he addressed the suicide note. At trial the Government proffered the testimony of that woman which would have revealed that Scouloukas told her he then believed that Lemonakis was in the area to kill him—a proffer suggesting the involuntariness of the exculpation in the suicide note. While the proffered evidence was no reason to exclude the note, it does appear to weaken the note's value to the defense. Second, the feature of the suicide note expressing Scouloukas' concern for his family itself suggested reason to suspect fabrication of the exculpation of Lemonakis. The fact that he had come

to the aid of Mrs. Scouloukas and her three children, when joined with Scouloukas' separate bond with Lemonakis as his cousin and long time associate, seem to indicate, as they did to the trial judge, feelings of gratitude and affection strong enough to prompt Scouloukas to attempt to exculpate Lemonakis in disregard of the truth. Finally, the trial judge expressed concern over the prejudice to appellant Enten's case because the Government might stress the note's failure to exonerate Enten. Although admission of the note was urged by Enten's counsel as well, he used the same argument separately to urge the court to permit Enten to testify as to assertedly exculpating conversations Enten had had with Scouloukas. The court's rejection of that argument to permit such testimony, not objected to here, may if done earlier have caused the potential prejudice of the note to outweigh Enten's reason for initially supporting its introduction.

ment; three witnesses, among them Perelli, see note 4, supra, testified to having seen stolen property there; and two friends of Schmidt testified to having received stolen property from him. At least four witnesses, including Perelli, also stated that Lemonakis was present at Schmidt's apartment during the active phase of the burglaries, at times with other members of the conspiracy besides Schmidt.

In addition to having placed both Lemonakis and contraband at Schmidt's apartment, Perelli also testified to having been paid by Lemonakis and Scouloukas to drive them to Schreiber's antique store in New York, see note 4, supra, carrying with them what appeared to be other contraband. Schreiber confirmed this meeting in his own testimony, stating that the item in question was offered to him for sale and that he took the item and the three men to a friend who might have been interested in making the purchase. Schreiber's friend confirmed having met with Schreiber and been offered the item. Schreiber also testified to having met with Lemonakis and Schmidt at his store approximately a year later, after he had learned an investigation was taking place.

The final operative conspirator aside from Lemonakis himself, Dolder, provided direct testimony of his meeting in Pittsburgh with Lemonakis, Scouloukas, and Schmidt on matters unrelated to those for which Lemonakis was indicted. He told of his later participation, after Scouloukas had obtained the list of vacant homes, in the burglary of the home which was the first substantive offense charged against Lemonakis, after he, Lemonakis, Scouloukas and Schmidt had discussed committing the offense. He further testified that all four of them approached the house together, and that he and Lemonakis actually entered the house and stole the property in question.

To whatever extent Scouloukas' recorded statements did serve to implicate Lemonakis in the conspiracy, then, the foregoing testimony would appear to have established that same implication independently and with a good deal more force, even considering the light sentence Dolder served after pleading guilty to certain offenses in this and another case, and the fact that Perelli and Schreiber had pleaded guilty to conspiracy in that latter case. It would thus appear the introduction of the recordings themselves would, if error, have been harmless;[27] and a fortiori reveals

---

27. There was also strong evidence connecting Lemonakis to the burglaries themselves, and not just the conspiracy, aside from Dolder's testimony. Illustratively, persons from Lemonakis' place of employment in Pennsylvania testified that his employment records reflected his absence during nearly all of the offenses with which he was charged, including that attested to by Dolder. Carolyn Corey, who lived in Pennsylvania, whose brother was a co-worker of Lemonakis, and who was self-described as being "very friendly" with Lemonakis, testified that she stayed at Schmidt's Maryland apartment during part of the most concentrated period of burglaries, and that Lemonakis was there before, during, and after she was, and with her while Scouloukas was discussing the value of what appears to have been stolen property. Miss Corey further testified that Lemonakis gave her what was an item of contraband, seen at Schmidt's apartment by Perelli, and her brother confirmed that he saw the item in the Corey parental home. She stated that, having falsely represented to Lemonakis that she had been subpoenaed by the grand jury investigating the burglaries, she was told by him not to say anything; and that Lemonakis had requested that she ask her brother to obtain from his employer Lemonakis' time records referred to above. One of the witnesses who testified to seeing Lemonakis, Scouloukas, and Schmidt together at the latter's apartment also stated that at that time Scouloukas gave him contraband from one of the homes Lemonakis was charged with burglarizing, and that Lemonakis and Schmidt appeared to express disapproval of the gift. And with regard to the large amount of contraband returned to the authorities by Enten during trial, Lemonakis' fingerprint was found on a painting stolen during another of the burglaries charged against Lemonakis.

the exclusion of the suicide note also to have been harmless, useful as the note could have been only to attack those recordings whose force had already been weakened by alternative means.

### III

Appellant Enten made a pretrial motion for discovery and inspection with regard to various records relating to electronic surveillance. Treating this motion as a "claim" within the meaning of Title VII, Organized Crime Control Act of 1970, 18 U.S.C. § 3504 (1970),[28] the Government, upon reviewing the records of the Department of Justice, submitted to the District Court a sealed exhibit containing the electronic surveillance logs of certain telephone conversations to which Enten was a party. In support of its memorandum of opposition to discovery and inspection of these logs, the Government attached the affidavit of Richard G. Kleindienst, then Deputy Attorney General of the United States. Certifying that disclosure of the facts contained in the exhibit other than to the court *in camera* would preju-

dice the national interest, the Deputy Attorney General stated that the telephonic overhearings of Enten's voice occurred during the course of a "national security surveillance" of the premises (in which Enten had no proprietary interest) described in the sealed exhibit; and that

> The surveillance was authorized by the President of the United States, acting through the Attorney General in the exercise of his authority related to the nation's *foreign affairs* as set forth in 18 U.S.C. § 2511(3).[29] (Emphasis added).

Following its *in camera* examination of the exhibit, the District Court denied by order appellant's motion for discovery and inspection. Conforming to the requirement it found in Alderman v. United States, 394 U.S. 165, 186, 89 S. Ct. 961, 973, 22 L.Ed.2d 176 (1969), which set forth the standards and procedures to be followed by a trial court in determining whether any evidence used to support the convictions there challenged was the product of an illegal electronic surveillance, the court also issued

---

28. The statute provides in relevant part that
> (a) In any trial . . .
> (1) Upon a *claim* by a party aggrieved that evidence is inadmissible because it is the primary product of an *unlawful act* or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;
> (2) disclosure of information for a determination if evidence is inadmissible . . . shall not be required unless such information may be relevant to a pending claim of such inadmissibility;
>
> .    .    .    .    .
>
> (b) As used in this section "*unlawful act*" means . . . *the use of any electronic . . . device . . .* in violation of the Constitution or laws of the United States. . . . (Emphasis added).

29. The provision cited, part of Title III, Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1968), provides in relevant part that
> Nothing contained in this chapter or in section 605 of the Communications

Act of 1934 . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a *foreign power,* to obtain *foreign intelligence* information deemed essential to the security of the United States, or to protect national security information against *foreign intelligence activities.* Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power. (Emphasis added).

a memorandum opinion which was to constitute its findings of fact and conclusions of law. The opinion characterized the issue before the court as "whether the Attorney General's authorization of a wire tap for the purpose of gathering foreign intelligence information violates the Fourth Amendment," and found the warrantless surveillance at issue to be lawful for the reasons expressed in the unreported opinion of the District Court in United States v. Clay [30] and its affirmance on review, 430 F.2d 165, 172 (5th Cir.), rev'd on other grounds, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971). Having so found, the court concluded that disclosure would be unnecessary, relying upon Giordano v. United States, 394 U.S. 310, 313, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). Appellant contends that the order denying his motion and the court's decision-making procedures related to it were error.

■ The issue of whether the President may, consistently with the Fourth Amendment, authorize through the Attorney General a national security electronic surveillance to gather foreign intelligence information without first obtaining a judicial warrant, was expressly reserved by the Supreme Court in United States v. United States District Court for the Eastern District of Michigan, 407 U.S. 297, 308, 322–323, 92 S.Ct. 2125, 32 L.Ed.2d 51 (1972).[31] Neither do we find it necessary to address this issue definitively in order to decide the case before us, for the reason that the logs supplied by the Department of Justice under seal are part of the record on appeal, albeit under seal and available only for *in camera* inspection by the

30. The extracted portion of that opinion reads in part that the District Court there was

aware, of course, of the abuses possible should an Attorney General authorize extensive wiretaps under the guise of collecting foreign intelligence information. But the court also recognizes that such investigations are, in many instances, vital to the maintenance of national security. The court agrees with the government's counsel that in determining whether to employ wiretapping the President or the Attorney General must make a judgment based on foreign policy considerations. It would not be feasible for the executive to attempt to bring to the court's attention all the factual and policy considerations supporting the decision. Moreover, it is the executive, not the judiciary, which alone possesses both the expertise and the factual background to assess the reasonableness of such a surveillance. From a purely practical standpoint, it is ridiculous to place on a United States Commissioner the burden of deciding what is and what is not a threat to national security. The court does not believe the judiciary should question the decision of the executive department that such surveillances are reasonable and necessary to the protection of the national interest.

31. That case invalidated warrantless electronic surveillance for domestic national security purposes. The Court was at

pains to differentiate this activity from intelligence gathering in respect of foreign powers and external threats to national security, and noted that support had been voiced for the view that prior judicial authorization was not required in this latter area. *See* 407 U.S. at 322 n. 20, 92 S.Ct. 2125. *See also* the concurring opinion of White, J., in Katz v. United States, 389 U.S. 347, 364, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *Compare* the concurring opinion of Douglas, J., joined in by Brennan, J., in *Katz, supra,* 389 U.S. at 359–360, 88 S.Ct. 507. *See also* the opinion of Douglas, J., in granting a stay in Russo v. Byrne, 409 U.S. 1219, 93 S.Ct. 21, 34 L.Ed.2d 30 (1972), and his dissent from the denial of the petition for certiorari in the same case, in which Brennan, J., also voted to grant the petition. 409 U.S. 1013, 93 S.Ct. 21 (1972).

In the last-mentioned case, which was an effort by a criminal defendant to prevent his prosecution from going forward, the Government conceded that a foreign intelligence surveillance had picked up conversations by one of the defense counsel. It made the logs available to the District Court, which examined them *in camera* and declared that they had no relevance to the case before it. The Ninth Circuit Court of Appeals, also with the *logs* available *in camera* (as was the Supreme Court on the subsequent petition for certiorari), declared that there was no standing to make the claim.

court; and we—that is to say, the three judges of the panel acting together *in camera*—have examined those documents.

That was, we hasten to add, a far from burdensome task, because the points of contact between Enten and the surveillance operations in question were as few in number as they were ephemeral in relation to this case. We were readily able to determine beyond all peradventure that (1) the surveillance itself was strictly within the framework of executive authorization of foreign intelligence gathering (2) neither Enten nor physical premises in which he had any interest was in any way the object of it, and (3) the occasions, and the contents, of his appearance in the logs have no relevance whatsoever to the circumstances, the issues, or the evidence involved in his having been criminally charged, tried, and convicted.

The care we have taken to limit access to the logs upon this appellate examination of them suggests our own awareness of the significant differences that exist between foreign intelligence operations and information, on the one hand, and that of the domestic variety, on the other. It is not in the national interest for revelation of either the existence or the product of the former to extend beyond the narrowest limits compatible with the assurance that no injustice is done to the criminal defendant accidentally and peripherally touched, as was Enten. In a field as delicate and sensitive as foreign intelligence gathering, we think there is every reason why the court should proceed *in camera* and without disclosure to explore the issue of whether the contents of a foreign intelligence surveillance have any relevance to a criminal prosecution plainly unrelated as to subject matter. In a context where, as here, external circumstances indicate such an improbability that the criminal defendant is likely to be adversely affected, we think that

> it is permissible . . . that information vital to the national security . . . be examined only *in camera*

to determine its relevance or materiality, although . . . [in other circumstances] all . . . information that may be the subject of a motion to suppress must be shown to the defendant or his counsel so that its materiality can be determined in an adversary hearing.

*Alderman, supra,* 394 U.S. at 201, 89 S. Ct. at 981 (Fortas, J., concurring in part and dissenting in part). *See also* the procedure followed in Russo v. Byrne, *supra* note 31; Title VII, Organized Crime Control Act of 1970, 18 U.S. C. § 3504(a)(2) (1970); Title III, Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(10) (1968).

In the present circumstances the task of ascertaining relevance is *not* "too complex, and the margin of error too great, to rely wholly on the *in camera* judgment" of this court "to identify those records which might have contributed to the Government's case." *Alderman, supra,* 394 U.S. at 182, 89 S.Ct. at 971. At the same time, the potentiality for needless damage to fragile international relationships—inherent and inescapable as the circle of disclosure widens —is correspondingly greater. We, therefore, find no basis for disturbing appellant Enten's convictions by reasons of this claim of error.

## IV

Appellants' remaining claims which merit discussion concern challenges to their convictions based upon asserted weaknesses or anomalies in the Government's evidence. Most serious among them is appellant Enten's claim that he was denied due process of law by the failure of the Government to produce until after trial an exculpatory memorandum of a May 13, 1971 interview between Scouloukas and a United States Attorney. In it Scouloukas stated that he did not approach Enten with regard to joining the conspiracy until after the first burglary had been accomplished, contrary to what he had told the grand jury on August 26, 1970.

■ Enten had, both before and during trial, moved for production of documents as required by the Jencks Act, 18 U.S.C. § 3500 (1970), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Government agreed to these requests, and pursuant thereto and by pretrial order of the District Court, all materials in the so-called "Scouloukas file" deemed appropriate for production by the Government, whose good faith we do not question, was provided to appellant.[32] In preparing its brief on appeal, the Government discovered the memorandum in question, and, after bringing it to the attention of this court and appellant, moved at oral argument to vacate Enten's conviction on, and to remand the case to the District Court to dismiss, the counts of burglary (count 2), grand larceny (count 3), and interstate transportation of stolen property (count 4) arising out of the first burglary, see note 1 supra; and conceded that the remand should include resentencing on the remaining counts. We hereby grant that motion and include for vacation of the conviction and remand for dismissal count 5 of the indictment, another charge of interstate transportation of stolen property from that same burglary.

■ In view of his proper request for such information, appellant complains now that, irrespective of the absence of bad faith, the memorandum that was withheld was "material" within the meaning of Brady, supra, 373 U.S. at 87, 83 S.Ct. 1194. He bases this claim on the assertion that the "main thread" of the prosecution was that appellant "was the mastermind and financier" of the conspiracy,[33] and that the memorandum establishes that appellant "was only an afterthought," concluding that its non-disclosure to the defense constituted prejudice that cannot be limited to the convictions which that non-disclosure permitted. We do not agree.

■ As the Supreme Court recently stated, a finding of "materiality" of the undisclosed evidence is required before a new trial is necessitated. Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L.Ed.2d 104 (1972). While the Court has not yet provided a definition of such materiality, Giles v. Maryland, 386 U.S. 66, 73–74, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967), the rule in this jurisdiction is that reversal is called for when, in the context of the case at bar, the undisclosed evidence "might have led the jury to entertain a reasonable doubt about appellant's guilt." Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287, 291 (1966), on appeal after remand, Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209, 1212 (1967).

Unlike the possibility of impeachment of the prosecution's key witness which was foreclosed by the Government's non-disclosure in Giglio, 405 U.S. at 154, 92 S.Ct. 763, and Levin, 363 F.2d at 292; 408 F.2d at 1215; cf. United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642, 645, 648 (1971), in the context of this case the issue of whether Enten was a member of the conspiracy at the time of the first of the six burglaries named in that part of the indictment against him was not so important

---

32. The file contained approximately twenty items, the bulk of which, including a 132-page memorandum of an interview with Scouloukas upon his resignation from the police force, memoranda of several subsequent interviews, his suicide note, a report in his own handwriting and the transcript of his grand jury testimony, were produced either before trial or during its first week. Given the voluminous nature of the file's contents and the court's own in camera examination of those contents to determine producibility, we cannot say the memoradum at issue was producible evidence which could not have escaped the attention of a diligent and fair-minded prosecutorial staff.

33. Appellant cites the prosecution's pretrial characterization of himself as the ringleader of the conspiracy, Wash. Eve. Star, Nov. 2, 1970, § B, at 1; and its opening statement at trial that the evidence would reveal a conspiracy with appellant "at the top as the fence mastermind."

a feature of the prosecution that its removal might have resulted in the creation of a reasonable doubt concerning appellant's guilt of the five later burglaries and fifteen other counts of which he was also convicted, *see* note 1 *supra.*

We do not think our application of the standard, speculative though it may be, is harsh under the circumstances of this case for, as two members of this panel stated in denying rehearing *en banc* in *Levin, supra,* this is not one of "those particular situations where a fair trial may have been significantly blurred" by the nondisclosure. 408 F.2d at 1222. *See Xydas v. United States,* 144 U.S.App. D.C. 184, 445 F.2d 660, 667, cert. denied 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). Appellant's emphasis on the prosecution's view of Enten as the "mastermind" of the conspiracy is unpersuasive, first, because our careful examination of the lengthy record before us reveals the prosecution did not present its case in that light during trial,[34] and second, to the extent that Enten's role was presented as central to the conspiracy in a financial sense, his non-participation as to the first burglary would surely have had minimal influence on the likelihood of his involvement in the numerous remaining burglaries charged,[35] and was as well a role fully supported by the evidence brought forth regarding those later burglaries.[36]

Thus, proper disclosure of the memorandum would not have affected the great portion of the Government's presentation in either its characterization of appellant or the evidence brought forth against him, nor, had those minimal alterations in the case been made, could they have led the jury to entertain the kind of doubt that would compel us

34. As an example we note that in the nearly 100 pages of transcript containing the Government's closing and rebuttal arguments, only one brief description of the nature of Enten's role was provided, and that was as a "criminal entrepreneur, the financier of this conspiracy, the man who made two-thousand per cent on each and every purchase that he made from the burglars." Later the Government stated:

> The issue in this case . . . is a very simple one. Did [Enten] enter into an arrangement with Scouloukas and Schmidt to burglarize houses, to steal, and to fence the stolen goods?

35. As mentioned earlier, Alfred Dolder testified that he, Scouloukas, Lemonakis and Schmidt participated in the first burglary in question on or about March 26, 1969. He stated that up until that time they did not have a fence to whom they could sell the stolen goods, but that after the burglary Scouloukas told him he thought he had a fence in "an interior decorator in Georgetown," with whom Scouloukas was going to meet the next day. Carolyn Corey, *see* note 27 *supra,* testified for the Government that during her stay at Schmidt's Maryland apartment in August 1969, she had occasion to hear Scouloukas complain that he was unable to cash a check he had received from an "interior decorator" for doing some work for him. We need not set

forth further evidence, such as that contained in the Enten recordings, *supra* note 14, to illustrate that the jury would not likely be shaken in its belief of Enten's guilt as to other offenses charged were it to have known that Enten had not been a part of the conspiracy for that first burglary. This is especially so considering Enten's uncontested possession of a substantial amount of contraband which he turned over to the authorities on July 15, 1971, without being able to produce any documentation regarding its purchase, and abundant testimony showing Enten's possession of other contraband throughout the post-burglary period.

36. The financing function is inherent in the activities of one who operates as a fence; and the evidence indicating appellant paid his co-conspirators for the goods they stole, *see, e. g.,* note 34, *supra,* and in turn sold those goods to third parties, establishes his position as the middle-man essential to the financial success of the conspiracy. As to the potential profitability of the enterprise, one of the purchasers of the contraband from Enten, Mary Wortman—a professional interior designer and appraiser who purchased the Charles clock, which she valued at $2,000.00, for $300.00—testified that the value of goods Enten temporarily stored at her home was approximately $250,000.00.

to reverse. Aside from the absence of suggestion from appellant as to how the conduct of his defense might have been altered to his advantage, we can imagine no significant addition to his basic position that he received the stolen property without guilty knowledge, *see* note 18 *supra*, that timely provision of the memorandum would have permitted. Whatever change counsel for appellant might have made would not, in our view, have been influential in the jury's verdict.

Of the fifteen remaining counts of which appellant Enten was convicted, he raises objection to three more which arise out of a single burglary. He complains that he cannot be convicted of both burglary (count 6) and grand larceny of the stolen property (count 7) and receiving that property in Maryland knowing it was stolen and bringing it into the District of Columbia (count 8), relying on Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). Enten was sentenced to not less than five nor more than fifteen years imprisonment on each of six counts of burglary, to run concurrently; to not less than forty months nor more than ten years on the single count of receiving stolen property; and to not less than forty months nor more than ten years on each of six counts of grand larceny, to run concurrently. All the foregoing sentences are to run consecutively with the sentence imposed for the conspiracy count, which was imprisonment for not less than twenty months nor more than five years.

■■■ Ignoring the convictions on the counts of burglary and grand larceny for the instant offense, and the convictions stemming from the first burglary which we earlier ordered vacated, appellant still stands properly convicted of four counts each of burglary and grand larceny for which identical concurrent sentences were imposed. Since it is the convictions for grand larceny and burglary on the one hand, and receiving stolen property on the other, that are mutually exclusive, the former sentences being the longer, we think that giving appellant the benefit of the doubt concerning which counts a properly instructed jury would have convicted him of, and vacating his conviction as to the longer counts, suffices "to cure any prejudices resulting from the trial judge's failure to instruct the jury properly," which failure is conceded by the Government. *Milanovich, supra*, 365 U. S. at 555, 81 S.Ct. 728.[37]

The judgment of conviction on the fourteen counts in No. 71–1745 is affirmed: The convictions on counts 2, 3, 4, 5, 6 and 7 in No. 71–1774 are vacated and remanded for dismissal, and that case is remanded for resentencing on the judgment of conviction on the remaining thirteen counts, which we affirm.

It is so ordered.

---

37. Appellant Enten's final objections challenge the trial judge's submission of certain charges to the jury on assertedly insufficient evidence, and his failure to grant appellant's motion for judgment of acquittal as to other charges. We think the evidence, though circumstantial, when viewed in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ; United States v. Fench, D.C.Cir., 470 F.2d 1234 (D.C.Cir. 1972), cert. denied, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973), supports

the denial of the motion as to both appellant's membership in the conspiracy and his guilt of the substantive crimes for which he was convicted, particularly in view of the derivative guilt made possible by Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *See, e. g.*, notes 3, 14, 35 and 36 *supra*. Similarly do we dispose of the nearly identical challenge to appellant Lemonakis' convictions, which were supported by comparatively stronger evidence. *See, e. g.*, note 27, *supra* and accompanying text.