**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Donald Eugene RYANS d/b/a Ryans Moving & Storage and Westside Movers, Defendant–Appellee.**

**No. 89–6096.**

United States Court of Appeals, Tenth Circuit.

May 8, 1990.

732

David Seidman, Atty., Dept. of Justice, Washington, D.C. (Charles F. Rule, Asst. Atty. Gen., Judy L. Whalley, Deputy Asst. Atty. Gen., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., Alan A. Pason, Katherine A. Schlech, Dana M. Campbell and David B. Shapiro, Attys., Dept. of Justice, Dallas, Tex., were also on the brief), for plaintiff-appellant.

William J. Skepnek, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, Okl. (Kindanne C. Jones, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, Okl. and C. Kevin Morrison, Tulsa, Okl., were also on the brief), for defendant-appellee.

Ellen Yankever Suni, University of Missouri at Kansas City School of Law, Kansas City, Mo., for amicus curiae Nat. Ass'n of Criminal Defense Lawyers, Inc.

Before HOLLOWAY, Chief Judge, and LOGAN and ANDERSON, Circuit Judges.

HOLLOWAY, Chief Judge.

The government appeals from a pretrial order of the district court granting the defendant-appellee's motion to suppress evidence as to two tape recordings in this criminal proceeding. This court has jurisdiction of the appeal pursuant to 18 U.S.C. § 3731.

I

A.

Defendant-appellee Donald Eugene Ryans ("Ryans") was charged with conspiring, together with unnamed co-conspirators, to restrain and suppress competition in the provision of moving services from Fort Sill, Oklahoma, in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act. Ryans moved to suppress three tape recordings of conversations between himself and Mr. Hughen, an immunized government informant, on the ground, *inter alia*, that the conversations were recorded in violation of Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility [hereinafter DR 7–104(A)(1), the "disciplinary rule", or the "rule"]. Following an evidentiary hearing, the district court suppressed two of the tapes on the ground that the disciplinary rule had been violated. This appeal followed and this court stayed

the trial pending the appeal.[1] We conclude that the district court erred in its application of the disciplinary rule in the circumstances of this case and improperly suppressed the recordings, and reverse.

In 1985 the Antitrust Division of the Department of Justice began a nationwide investigation of national moving carriers and agents who were engaged in the transport of household goods for military personnel. In March or April of 1986, attorneys in the Antitrust Division's Dallas, Texas, office instructed Special Agent Granville Long of the F.B.I. in Lawton, Oklahoma, to begin an investigation of movers at Fort Sill, Oklahoma. Shortly thereafter one of the suspected conspirators, Kenneth Hughen, then president of the local movers' association, agreed to cooperate with the government in exchange for immunity from prosecution. (Long Tr. at 19; Hughen Tr. at 68–70.)

Hughen agreed to record telephone conversations with numerous investigation "targets," including Ryans. (Long Tr. at 21.) Government prosecutors instructed Hughen to call members of the movers' association and engage in conversation concerning the alleged agreements and rate setting practices, and to record his conversations. (Hughen Tr. at 82–83.) The prosecutors acted primarily through Agent Long, although the record shows that on at least one occasion the government attorneys met directly with Hughen. (Hughen Tr. at 68–70.) Although Hughen had already agreed to cooperate with the government, the prosecutors issued a grand jury subpoena to Hughen, much like those issued to each of the investigation targets, to conceal his newfound loyalty. This stage of the investigation lasted approximately three months, during which time Hughen recorded some conversations. Three of these were telephone conversations with Ryans.

The first telephone call to Ryans occurred on May 19, 1986, five days after Ryans had been served with a federal grand jury subpoena duces tecum. A transcript of the conversation reveals that the two men discussed, among other things, the problems associated with complying with the subpoenas and the need for legal representation.[2] Hughen delivered the tape of the May 19 interview to Agent Long on May 29, 1986. (Long Tr. at 31/ Hughen Tr. at 99.)

The second tape recording was made on June 5, 1986. (Hughen Tr. at 100–101.) A transcript of this conversation also reveals that Ryans' legal representation was discussed. Ryans stated that he had met with and had obtained advice from his lawyer concerning the subject of the investigation.

---

1. Ryans does not challenge the district court's denial of his motion with respect to the one tape not suppressed. We are therefore concerned only with the second and third tape recordings.

2. The following dialogue occurred:

   Mr. Hughen: Have you talked to any attorney or anything like that? Do you plan—
   Mr. Ryans: I'm going—I'm going down tomorrow and go over that with old J. Roy [Cocke] and see what—
   Mr. Hughen: See what he has to say about it?
   Mr. Ryans: —see what he thinks.

   Transcript of Conversation ("Tr.Conv."), May 19, 1986, p. 12, lines 2–7.

   * * * * * *

   Mr. Ryans: Well, I don't know. I'm going to—I'm going down tomorrow and be advised.
   Mr. Hughen: Yeah. I think you should.

   Id. at p. 16, lines 15–17.

   * * * * * *

   Mr. Ryans: I'll just lay the cards out on the table and let him know, all that I know and all that's going on and then let him advise on it.
   Mr. Hughen: Yeah. Let him tell you, but— but you ought to tell him exactly what did happen and all that so—so he will know how to advise you.
   Mr. Ryans: Yeah, I'm going to tell him exactly.

   Id. at p. 16, line 20 to p. 17, line 1; see also id. at p. 19, line 18 to p. 20, line 3.

   * * * * * *

   Mr. Hughen: You might touch base with me after you talk to your lawyer and see what— let's kind of compare notes and see if our lawyers are all kind of going in the same direction and see if they're telling us about the same thing.

   Id. at p. 21, lines 5–8.

Indeed, in response to some prompting by Hughen, Ryans disclosed the substance of that advice. *See* Tr.Conv. at 26:8–29:18; 33:22–34:13. The June 5 tape was delivered to agent Long on June 12, 1986. (Hughen Tr. at 108.)

The third taped conversation between Hughen and the defendant occurred on June 18, 1986, six days after Long received the second tape and one day after Ryans delivered documents to Agent Long in compliance with the grand jury subpoena. (Long Tr. at 47–48.) A transcript of this conversation reveals that defendant Ryans reported to Mr. Hughen about his meeting with Agent Long the previous day and again discussed advice that he had received from counsel. Tr. Conv. at 42:18–21; 55:13–18; 61:24–63:4; 64:6–22.

Mr. Hughen's inquiries into the substance of Ryans' attorney-client communications were, according to agent Long, contrary to the instructions that he had given to Hughen sometime during the investigation.[3] (Long Tr. at 40–42.) Agent Long testified that sometime in May 1986 he advised one or more of the government prosecutors of his concerns regarding Mr. Hughen's performance as an informant. *Id.* The district court found that the government attorneys were aware that the recordings were being made and were informed of their contents. Order at 5.

## B.

Ryans was charged on January 19, 1989, in a one-count indictment with alleged price-fixing in violation of the Sherman Act, 15 U.S.C. § 1. Prior to trial Ryans moved to suppress introduction of the tapes on the ground that the conversations were recorded in violation of DR 7–104(A)(1). The district court denied the motion to suppress as to the first of the

recordings, but granted Ryans' motion as to the second and third recordings.

The court found that "[a]t the time these [second and third] tapes were made, it was clear that defendant Ryans had retained counsel regarding the investigation for which the recordings were made", *id.* at 9, and that the government prosecutors knew, either directly or indirectly through Agent Long, that Ryans was represented by counsel. *Id.* The court further found that Mr. Hughen was acting under the direct control and supervision of Agent Long and that he "participated actively in the conversations and deliberately elicited information from the defendant in the absence of counsel regarding the alleged conspiracy and communications between the defendant and his counsel...." Order at 8. The court concluded that the government attorneys investigating the case had breached their ethical obligations under the disciplinary rule.

The court then considered the available remedies, ranging from simple admonishment of the attorneys involved to dismissal of the indictment. The court thought that *United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), might be controlling and accordingly imposed the intermediate remedy of suppression. (Order at 9.) The government appeals.

## II

The issue presented on appeal is whether the government's use of an informant to initiate and record conversations with a suspect prior to indictment, but after the suspect has retained counsel in connection with the subject matter of the criminal investigation, violates Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility.[4] DR 7–104(A)(1) provides that

---

3. The district court doubted that any such instructions were given. "The more credible evidence supports a finding that these admonishments, if any were in fact given, were insufficient." Order at 3.

4. The Code is not controlling in the federal courts, but it may be enforced pursuant to the courts' inherent supervisory power over the attorneys practicing before them. *In re Snyder*,

472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985). The Western District of Oklahoma, through Local Rule 4(J)(4)(b), has incorporated those rules of professional responsibility adopted by the Oklahoma Supreme Court. Although the Oklahoma Court has since adopted the ABA Model Rules of Professional Conduct to govern attorneys' conduct in Oklahoma (effective July 1, 1988), at the time of the

During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Model Code of Professional Responsibility DR 7–104(A)(1).

Ryans contends, and the district court held, that the second and third tape recordings were made in violation of DR 7–104(A)(1) because at the time those tapes were made, Ryans was represented by counsel within the meaning of the rule, and that the government either directly or indirectly knew that Ryans was represented by counsel. Since Hughen was acting on behalf of the United States Attorney's office, all of his communications with Ryans were in violation of the rule and therefore should not be admitted in evidence. The government argues that Ryans was not represented by counsel within the meaning of the rule, and that in any case the disciplinary rule is not intended to prohibit investigative contact with a person—even if represented by counsel—prior to the accusatory phase of the criminal process. By analogy to the Sixth Amendment, the government argues that the rule should not attach until adversary proceedings have commenced.

With the exception of the district court's finding that Ryans did not waive the attorney-client privilege, *see* note 13 *infra*, we accept the factual findings made below. With that exception, we believe the subsidiary historical factual findings of the court are supported by the record and therefore are not clearly erroneous.[5] As our analysis shows, we disagree with the legal conclusion of the district court that the discipli-

nary rule applies before the commencement of adversarial proceedings.

We first consider whether Ryans was entitled to the protection of DR 7–104(A)(1) when the recordings were made in May and June of 1986, that is approximately two and one-half years prior to his indictment by the grand jury in January of 1989. The parties do not dispute the applicability of DR 7–104(A)(1) to criminal cases, to public prosecutors, or to their agents, when they act as the "alter ego" of prosecuting attorneys. *Cf. United States v. Massiah*, 307 F.2d 62, 66 (2d Cir.1962), *rev'd on other grounds*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). It is now well settled that DR 7–104(A)(1) applies to criminal prosecutions as well as to civil litigation. *United States v. Thomas*, 474 F.2d 110 (10th Cir.), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *see also United States v. Hammad*, 858 F.2d 834, 837–38 (2d Cir.1988); *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir.1983) ("DR 7–104(A)(1) may be found to apply in criminal cases ... to government attorneys [and] to non-attorney government law enforcement officers when they act as the alter ego of government prosecutors."); ABA Standards Relating to the Administration of Criminal Justice, Standard 3–4.1 (commentary).

The applicability of DR 7–104(A)(1) to the investigative stage of a criminal prosecution presents a more difficult question. The federal courts of appeal that have considered this question are not in agreement. A number of courts have held that DR 7–104(A)(1) does not apply to situations like the one before us. *See United States v. Sutton*, 801 F.2d 1346, 1366 (D.C.Cir.1986); *United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir.), (pre-indictment use of informant to gather information against repre-

---

recordings at issue the Code of Professional Responsibility was in effect in Oklahoma.

**5.** The government vigorously disputes the district court's findings that "Ryans had retained counsel regarding the investigation for which the recordings were made," and that the prosecuting attorneys knew, either directly or indirectly, that Ryans was represented by counsel by the time the second and third tape recordings

were made. *See* Order at p. 9. Although the record evidence is not overwhelming, we believe it amply supports the district court's conclusions. In any case, our decision on the applicability of the disciplinary rule to the facts of this case renders a closer evaluation of the government's position on this point unnecessary.

736

sented suspect did not violate the rule), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.) ("the government's use of such investigative techniques at this stage of a criminal matter does not implicate the sorts of ethical problems addressed by the Code."), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lemonakis,* 485 F.2d 941, 955 (D.C.Cir.1973) (disciplinary rule not applicable prior to indictment and, in any case, use of an informant to initiate and record conversations with the defendant prior to his arrest or indictment did not violate the rule), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974).

Three circuits, including this one, have held that the rule either does or may apply to a *custodial,* pre-indictment interview of a defendant in the absence of and without the consent of retained counsel. *See United States v. Thomas,* 474 F.2d 110, 112 (10th Cir.) (custodial, post-arrest interview), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *see also United States v. Killian,* 639 F.2d 206, 210 (5th Cir.) (same), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *United States v. Durham,* 475 F.2d 208, 211 (7th Cir.1973) (custodial, pre-indictment interview of a defendant in the absence of retained counsel "raise[s] ethical questions" under DR 7–104(A)(1)). Here we clearly are not concerned with a custodial interview.

Only the Second Circuit has purported to apply the rule in a non-custodial, pre-indictment setting. *See United States v. Hammad,* 858 F.2d 834 (2d Cir.1988).[6] However, the *Hammad* court did not enforce the rule there because, the court said, "the government should not have its case preju-

diced by suppression of its evidence when the law was previously unsettled in this area." 858 F.2d at 842.[7]

In *United States v. Thomas,* this court addressed the applicability of the disciplinary rule only in the limited context of a custodial, albeit pre-indictment, interview between a government agent and a defendant. There a special agent of the Albuquerque Bureau of Narcotics and Dangerous Drugs interviewed Thomas in prison at Thomas' request in the absence of and without the knowledge of his attorney. After signing a waiver of his Miranda rights, Thomas gave the investigator a written statement. Although the defendant was not indicted until one day after the interview, he had been formally served with a criminal complaint on September 21, 1971; had counsel appointed on September 22; had appeared together with his appointed counsel at a preliminary hearing on September 28; and was in the custody of the state when the interview was conducted on October 18, 1971.

At Thomas' trial, the statement was admitted over the objection of defense counsel and used during Thomas' cross-examination by the prosecution. The court held that this use of the statement violated both the letter and the spirit of the canons of ethics, 474 F.2d at 112, but refused to reverse the conviction because "[w]e have not passed on this question before and the prosecution had no notice of the position of this court on the subject until this appeal." *Id.* at 112. However, the court left no doubt that in the future evidence gathered through such violative conduct must be excluded.

[O]nce a criminal *defendant* has either retained an attorney or had an attorney appointed for him by the court any statement obtained by interview from such

6. Prior to the Second Circuit's decision in *Hammad,* that court considered the applicability of DR 7–104(A)(1) to criminal investigations "doubtful," *see United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982), but the question remained open until *Hammad. See, e.g., United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983).

7. In *United States v. Schwimmer,* 882 F.2d 22 (2d Cir.1989), the Second Circuit held that DR

7–104(A)(1) does not preclude a prosecutor from questioning a convicted defendant known to be represented by counsel before a grand jury. The court distinguished *Hammad* and held that the appearance and questioning of an immunized witness before a grand jury is "authorized by law" and therefore does not transgress the disciplinary rule. 882 F.2d at 28–29.

defendant may not be offered in evidence for any purpose unless the *accused's* attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present.

*Id.* at 112. (emphasis added). Ryans now urges this court to extend the rule announced in *Thomas* to the situation before us: a non-custodial setting, prior to Ryans' charge, arrest, or indictment.

Although the interview in *Thomas* occurred prior to his indictment, the formal adversary process had clearly begun. Thomas' Sixth Amendment right to counsel had already attached. *See Moran v. Burbine,* 475 U.S. 412, 428–30, 106 S.Ct. 1135, 1144–46, 89 L.Ed.2d 410 (1986) (right to counsel attaches upon "first formal charging proceeding" or as soon as "the government's role shifts from investigation to accusation."); *see also Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). We recognize that the court's language in *Thomas* might be read to apply to a non-custodial environment like the one before us, but we do not believe that *Thomas* requires a broader rule than was required by the facts before the court then. *Thomas* relied on authority from the Fifth and Ninth Circuits that involved the application of the then applicable canon of ethics only to custodial interrogation of the accused after the adversary process had begun. *See United States v. Four Star,* 428 F.2d 1406, 1407 (9th Cir.) (condemning "in-custody interrogation of an accused person known to be represented by counsel without affording counsel an opportunity to be present."), *cert. denied,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); *Wilson v. United States,* 398 F.2d 331, 333 (5th Cir.1968) (denouncing "[g]overnment interrogation of a person in custody pending trial, in the absence of counsel which the interrogator knew had been appointed to represent the defendant"), *cert. denied,* 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); *Coughlan v. United States,* 391 F.2d 371, 372 (9th Cir.) (denouncing interviews of "accused persons in jail in the absence of counsel"), *cert. denied,* 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968). Nothing in the court's opinion in *Thomas,* or in the cases upon which it relied, suggests that the court intended to extend the protections of the disciplinary rule to non-custodial, pre-indictment investigative interviews.

Moreover, the rule announced in *Thomas* is expressed in terms that clearly contemplate an adversarial relationship between the state and the defendant. *See Thomas,* 474 F.2d at 112 (holding expressed in terms of the "criminal defendant", and the "accused"). We again emphasize the factual setting in *Thomas:* the defendant had been served with a criminal complaint, had had counsel appointed for him, had appeared with appointed counsel at a preliminary hearing, and was in custody at the time of the interview. We are persuaded that use of a statement obtained from the defendant under those circumstances, without the benefit of counsel, raises considerations qualitatively different from those presented here.

Ryans relies heavily on the Second Circuit's decision in *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), and urges that we adopt its reasoning here. In *Hammad,* a government prosecutor directed an informant to arrange and record a meeting with represented suspects in an arson investigation. The prosecutor supplied the informant with a fictitious grand jury subpoena to "create a pretense that might help the informant elicit admissions...." 858 F.2d at 840.[8] The meeting occurred six

---

**8.** Ryans argues that Hughen's subpoena was a "sham" inasmuch as Hughen's agreement to cooperate with the government made it unnecessary. He argues, therefore, that it is indistinguishable from the subpoena condemned as a "sham" in *United States v. Hammad.* We do not agree. The Second Circuit relied on *United States v. Martino,* 825 F.2d 754 (3d Cir.1987) for the proposition that fake subpoenas were improper, but that case seems to say exactly the opposite. *See id.* at 760 ("If government officials may pose as nonexistent sheiks in an elaborately concocted scheme ..., supply a necessary ingredient for a drug operation ..., and utilize landing strips, docking facilities, and other accoutrements of an organized smuggling operation ..., all in order to catch criminals, then their use of a subpoena in the name of an

months before the grand jury returned an indictment, which was based in large part on the informant's recordings. The trial court found that the government "was clearly aware" that the suspect was represented by counsel at the time of the meeting and suppressed the tapes. *United States v. Hammad,* 678 F.Supp. 397 (E.D. N.Y.1987). On appeal, the Second Circuit held that the disciplinary rule applied, and that "in light of the underlying purposes of the professional responsibility code and the exclusionary rule, suppression may be ordered [for a prosecutor's violation of DR 7–104(A)(1)] in the district court's discretion," 858 F.2d at 840, but reversed the district court's suppression of evidence under the rule as an "abuse of discretion." *Id.* at 837.

The court first rejected the government's argument that DR 7–104(A)(1) is co-extensive with the Sixth Amendment, and hence, inapplicable prior to indictment. The court noted several decisions applying the rule irrespective of the Sixth Amendment, especially Judge Weinstein's opinion in *United States v. Jamil,* 546 F.Supp. 646, 655–58 (E.D.N.Y.1982):

> Judge Weinstein ... exhaustively considered the government's contention that DR 7–104(A)(1) is co-extensive with the Sixth Amendment. He noted that several courts have hinted at this unity and treated the disciplinary rule as little more than an appendage to the constitutional provision, without independent import in this context. Such treatment, however, makes the rule superfluous, and 'is neither apparent nor compelling.' The Sixth Amendment and the disciplinary rule serve separate, albeit, congruent purposes.

858 F.2d at 838–39 (citations omitted). Following this lead, the court reasoned that whereas the Constitution defines only the "minimal historic safeguards" which criminal defendants must receive (quoting *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943)),

the Model Code of Professional Responsibility imposed a broader duty on attorneys "to maintain the highest standards of ethical conduct." (quoting Preamble, Model Code of Professional Responsibility (1981)). The court said:

> The Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution.

858 F.2d at 839.

Finally, the *Hammad* opinion rejected the invitation to tie the Code's applicability to the time of indictment. The court reasoned that because the timing of an indictment's return lies substantially within the control of the prosecutor, "a government attorney could manipulate grand jury proceedings to avoid its encumbrances." *Id.*

Having decided that DR 7–104(A)(1) applies in a pre-indictment, non-custodial context, the court was faced with a dilemma: how to apply the rule to communications made during a criminal investigation without crippling legitimate law enforcement activity. *See, e.g., United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983). Rejecting the district court's limiting construction of the rule, *see Hammad,* 678 F.Supp. at 401, the court instead carved out an exception to the rule for "legitimate investigative techniques." 858 F.2d at 839. The court reasoned that, by its terms, DR 7–104(A)(1) only applies to attorney communications that are not otherwise "authorized by law." Therefore, since a prosecutor's office authorizes him to conduct and supervise criminal investigations, "[a]s we see it, under DR 7–104(A)(1), a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising

undercover agent to enable him to retain his credibility with suspected criminals seems innocuous by comparison."). In any event, the subpoena at issue in this case was not fictitious;

it was simply unnecessary. Government agents may "employ appropriate artifice and deception to ferret out illegal activities." *United States v. Szycher,* 585 F.2d 443, 449 (10th Cir.1978).

criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." 858 F.2d at 839. The court agreed with the district court's conclusion that the use of a sham subpoena was improper and thus not protected by this exception. Nevertheless, the Second Circuit reversed the district court's suppression of evidence under the rule as an abuse of discretion, reasoning that "the government should not have its case prejudiced by a suppression of its evidence when the law was previously unsettled in this area." *Id.* at 842.

■ We must disagree with the *Hammad* opinion's interpretation of the rule. We are not convinced that the language of the rule calls for its application to the investigative phase of law enforcement. In contrast to DR 7–104(A)(2), which prohibits a lawyer representing a client from giving advice to a "person" who is not represented by counsel, DR 7–104(A)(1) prohibits communications with a "party." Black's Law Dictionary defines party as "a litigant, or a person directly interested in the subject matter of a case." Moreover, the rule concerns a lawyer's conduct "[d]uring the course of his representation of a client," and is limited to communication "on the subject matter of the representation" with a party represented by counsel "in that matter." Although the Code does not define these terms, the rule appears to contemplate an adversarial relationship between litigants, whether in a criminal or a civil setting. This interpretation is consistent with the policies underlying the disciplinary rule and the ethical canon from which it derives. We agree, for example, with the District of Columbia Circuit's conclusion that the contours of the "subject matter of the representation" are uncertain during the investigative stage of the case, and therefore less susceptible to the damage of "artful" legal questions which the disciplinary rule is designed in part to avoid. *See Lemonakis,* 485 F.2d at 956.

The rule requires that the lawyer respect an adverse party's choice to be represented by skilled counsel. The rule appears to be intended "to protect a defendant from the danger of being 'tricked' into giving his case away by opposing counsel's artfully crafted questions." *Jamil,* 707 F.2d at 646. Logically, these concerns are implicated after the parties are in an adversarial relationship. *Cf. United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (Sixth Amendment right to counsel attaches only where "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both.").

■ During the investigative stage of a criminal proceeding, counterveiling policies militate against a broad reading of DR 7–104(A)(1). We agree with the majority of courts which have considered the question that DR 7–104(A)(1) was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel. *See United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986); *United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.) ("We do not believe that DR 7–104(A)(1) ... was intended to stymie undercover operations when the subject retains counsel."), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982) (per curiam) ("Such a principle would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations. Even assuming this provision of the Code to be applicable to a criminal investigation, which is doubtful, it was not intended to lead to such a result."); *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.) ("[T]he government's use of such investigative techniques at this stage of a criminal matter does not implicate the sorts of ethical problems addressed by the Code."), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Lemonakis,* 485 F.2d 941, 955–56 (D.C.Cir. 1973) (the "communication" proscribed by the Code "does not in our view embrace the initiation and recording of the conversations between [the informant] and appellants."), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). A broader interpretation of the rule to cover this type

of investigative activity would seem inconsistent with the general view expressed by the Supreme Court in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As the District of Columbia Circuit observed in *Lemonakis:*

> [W]e cannot say that at this stage of the Government's investigation of a criminal matter, the public interest does not ... permit advantage to be legally *and ethically* taken of 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'

*Lemonakis,* 485 F.2d at 956 (quoting *Hoffa*, 385 U.S. at 302, 87 S.Ct. at 413) (emphasis added). Under Ryans' view of the rule, once the subject of an investigation retains counsel, investigators would be unduly restricted in their use of informants to gather additional evidence.[9]

■ We hold that DR 7–104(A)(1)'s proscriptions do not attach during the investigative process before the initiation of criminal proceedings. On these facts, we hold that the adversarial process had not yet begun. Although Ryans had been targeted for investigation and had been served with a grand jury subpoena duces tecum, he had not been charged, arrested or indicted, or otherwise "faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (describing the onset of adversarial proceedings for purposes of the Sixth Amendment right to counsel); *see Fitterer*, 710 F.2d at 1333 (rejecting contention that where counsel had been retained for grand jury investigation, DR 7–104(A)(1) was intended to restrict undercover investigations).

Ryans argues that the interpretation of the disciplinary rule we adopt renders it meaningless in the criminal context because it gives no protections beyond those provided by the Sixth Amendment and the decisions which implement it. We do not agree. The argument overlooks the fact that exclusion of evidence is not the only possible remedy under the disciplinary rule. Violations of DR 7–104(A)(1) may furnish a basis for sanctions against the offending attorneys. We do not address appropriate remedies for violations of DR 7–104(A)(1) here since we hold that the rule does not apply until the commencement of criminal proceedings.

■ The amicus argues that remedial action is warranted in this case because the prosecutor permitted Hughen to systematically invade Ryans' attorney-client relationship. The important policies underlying the disciplinary rule would be undermined, the amicus says, if the fruits of the prosecutor's "orchestrated effort to obtain information from defendant and others in this case" are not suppressed. While we agree that this is a troubling issue and do not commend the government's conduct, we do not believe that the disciplinary rule should apply in these circumstances. We are persuaded that the perceived threat to the integrity of the attorney-client relationship is outweighed here by the government's interest in effective law enforcement.[10] When the government's role shifts from investigation to accusation, however, then the balance of the interests at stake shifts. Clearly, if adversary proceedings had begun here, this would be a different case. *Cf. Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United*

---

**9.** The Second Circuit recognized that a broad reading of the disciplinary rule would impede investigatory practices, *see, e.g., Hammad*, 858 F.2d at 839 (noting that career criminals with permanent "house counsel" could immunize themselves from infiltration by informants, especially where counsel are retained in connection with an ongoing fraud or criminal enterprise), and therefore exempted such practices from the rule's prohibitions.

**10.** This is clearly not an example of government conduct that is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *see United States v. Warren*, 747 F.2d 1339, 1341–44 (10th Cir.1984); *United States v. Gamble*, 737 F.2d 853, 856–60 (10th Cir.1984).

*States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[11]

The district court was concerned with Hughen's persistent inquiry into confidential attorney-client communications, not only in his conversations with Ryans, but also in his conversations with the other association members.[12] Thus, at the evidentiary hearing on Ryans' suppression motion, the court asked counsel to address in their briefs to the court the "heightened sensitivity, if any, we have in this case by reason of the interrogations with regard to the ... attorney/client communications...." (Tr. at 85). We feel the purpose of the disciplinary rule is to prohibit *all* communications between an attorney and a represented party, but after initiation of adversary proceedings. It does not afford any special protection to communications otherwise protected by the attorney-client privilege.[13]

### III

Accordingly, the district court's order suppressing the second and third tape recordings is REVERSED; the order staying trial on the instant criminal charge is VACATED; and the cause is REMANDED to

the district court for further proceedings in accord with this opinion.

---

**11.** This is not a case where government prosecutors have placed an informant directly in the "defense camp" (of an indicted defendant) and thereby gained access to confidential defense planning. Such a knowing invasion of the defense camp would taint the entire prosecution with a Sixth Amendment violation. *See Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Levy,* 577 F.2d 200 (3d Cir.1978).

**12.** Of the 991 pages of transcript of conversations recorded by Hughen, 302 pages contain references to the subjects' communications with their attorneys. (Tr. at 85; Def.'s Exh. 5).

**13.** We note that these tapes are not protected by the attorney-client privilege. The attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party. *United States v. Bump,* 605 F.2d 548 (10th Cir.1979); *see also United States v. Jones,* 696 F.2d 1069 (4th Cir.1982) ("any voluntary disclosure by the client to a third party waives the privilege"). This is true even if the disclosure is inadvertent. *See e.g.,*

*Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 24 (9th Cir.1981) (voluntary disclosure of the content of a privileged attorney communication, even if inadvertent, "constitutes waiver of the privilege"); *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984) (same); *In re Grand Jury Investigation,* 604 F.2d 672, 675 (D.C.Cir.) ("An intent to waive [the attorney-client] privilege is not necessary for such a waiver to occur."), *cert. denied,* 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); 8 Wigmore on Evidence § 2327 at 635 (McNaughton rev. 1961 & 1987 Supp.). *But see Helman v. Murry's Steaks, Inc.,* 728 F.Supp. 1099, 1104 (D.Del.1990) (inadvertent disclosure *by counsel* does not waive the privilege). Here, Ryans willingly, though unwittingly, disclosed the substance of his attorney's advice to Hughen, and thereby waived the privilege. "[T]he confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In Re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989).