UNITED STATES of America,

v.

Barney WARD, George Lindemann, and Marion Hulick.

No. 94 CR 483.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 8, 1995.

---

James B. Burns, United States Attorney, Steven A. Miller, Susan Cox, Assistant United States Attorneys, Chicago, IL, for U.S.

Victor J. Rocco, Gordon Altman Butowsky Weitzen Shalov & Wein, New York City,

Gregory C. Jones, Carolyn McNiven, Grippo & Elden, Chicago, IL, for Barney Ward.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

In this opinion, the Court addresses one of the remaining motions filed by Defendants in this case. Defendant Barney Ward has moved to suppress what the Court will label the 1992 Tapes and the 1994 Statements. Ward's motion is not premised on a violation of the Constitution. Instead, Ward seeks suppression on the novel ground that the Government obtained the 1992 Tapes and the 1994 Statements in violation of Rule 4.2 of the Rules of Professional Conduct for the Northern District of Illinois. Rule 4.2 provides:

> During the course of representing a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the first lawyer has obtained the prior consent of the lawyer representing such other party or as may otherwise be authorized by law.

Ward's contention that Assistant United States Attorney Steven Miller violated Rule 4.2 raises issues not yet addressed by the Seventh Circuit or any other court in the Circuit. For the reasons set forth below, the Court will deny the motion to suppress and finds no basis to hold an evidentiary hearing.

## BACKGROUND

For purposes of this motion, the Court has considered the various affidavits tendered by the parties concerning the contacts between the Government, Ward and counsel for Ward prior to his indictment. The following represents a summary of the facts contained within those affidavits. Notably, the Government argues that, even assuming the truth of the facts asserted by Ward, the Government has not violated Rule 4.2 and suppression is not warranted.

On March 4, 1992, FBI Special Agent Peter Cullen telephoned Barney Ward at his home in Brewster, New York. According to

Ward, Cullen informed him that the United States Attorney's Office for the Northern District of Illinois was investigating an alleged scheme involving the deliberate killing of horses to defraud insurance companies. Cullen told Ward that an individual named Thomas Burns had been arrested in February 1991 for the killing of a horse named Streetwise. Cullen asked questions about Burns, also known as Tim Ray in the indictment. Ward answered those questions. Ward states that Cullen told him that he was not a target of the investigation. Cullen also asserts that at this time Ward was not viewed as a suspect or target of the investigation. Agent Cullen asked Ward if he would speak to agents in person. Ward told Cullen that he would get back to him. Ward states that he intended to consult with his attorney before agreeing to an in-person interview.

Ward asserts that he then consulted with his attorney, Victor J. Rocco. Rocco agreed to contact Agent Cullen. Agent Cullen indicates that he received a call on March 4, 1992, from Andrew Heine who indicated that he represented Ward. Beyond this communication, Cullen has no record of Heine ever contacting him again.

On March 9, 1992, Rocco phoned Agent Cullen and informed Cullen that he represented Ward. After describing the nature of the investigation and noting that AUSA Steven Miller was supervising it, Agent Cullen told Rocco that Ward was not a target of the investigation. According to Rocco, Cullen stated that the Government's interest in interviewing Ward was to obtain corroboration of certain facts about Thomas Burns. Rocco concluded the conversation by indicating that he would talk to Ward and get back to Cullen.

According to Rocco, he contacted Agent Cullen again on March 10, 1992. Agent Cullen does not indicate in his affidavit any phone call from Rocco on March 10, 1992. As asserted by Rocco, he told Cullen that Ward had apparently already answered the pertinent questions. He also told Agent Cullen that he was unwilling to allow Ward to be interviewed directly by other government agents. Rocco suggested that the government would need a subpoena to speak with Ward. Rocco further states that he told Agent Cullen that the Government was not to communicate with Ward and that any communications regarding the investigation should be handled through him.

According to Agent Cullen, he never informed AUSA Miller about his contact with Rocco or Heine. Further, Cullen states that he first received information indicating Ward's alleged involvement in the crimes under investigation in June 1992.[1] At this time, Paul Valliere, a target of the investigation, revealed in an interview that Ward had arranged for him to hire Burns to kill his horse. In addition to Valliere and Agent Cullen, AUSA Miller and Anton Valukas, counsel for Valliere, were also present at this interview. By the time of Valliere's revelation, Agent Cullen indicates that he had forgotten about his contact with Victor Rocco due to the massive nature of the investigation. Prior to Valliere's statements implicating Ward, the Government contends that its investigation did not focus on Ward because their principal cooperating witness, Burns, had steadfastly denied that Ward had any involvement in the matters under investigation.

### The 1992 Tapes

As part of Valliere's agreement to cooperate in the investigation, he agreed to surreptitiously record conversations with Ward. On June 8, 1992, Valliere recorded a telephone conversation with Ward. Valliere also recorded two more conversations with Ward

---

1. In a supplemental submission to the Court, Defendant produced an Illinois State Police investigative report dated January 28, 1991. That report notes that a confidential source suspected the possibility of Ward's involvement in a horse killing for George Lindemann in December 1990. Defendant argued that this report, produced by the Government in discovery, indicates that Ward was a target long before June 1992. Defendant Ward, however, failed to indicate when this report came into the Government's hands. In response to the supplemental submission, the Government has tendered the affidavit of Agent Cullen who says that he has never read this report and that it was produced to the FBI in January 1995. The Court finds no basis to conclude that this investigative report has any bearing on the motion to suppress.

on October 5, 1992, and November 20, 1992. Rocco maintains that he was never contacted by any representative of the Government to seek his permission to communicate with Ward. These three taped conversations are the 1992 Tapes Ward seeks to suppress.

### The 1994 Statements

On February 16, 1994, AUSA Miller, and Special Agent Cullen, accompanied by four other FBI agents, showed up at a trailer camp in Wellington, Florida, where Ward was staying while competing in a horse show in the area. According to Ward, AUSA Miller informed him that he was a target of the investigation and told him that the Government planned to indict him in the immediate future. Ward asserts that AUSA Miller told him that the Government's case was overwhelming and that the purpose of the meeting was for him to consider his cooperation options. Ward states that he told AUSA Miller that he was represented by counsel that his counsel had spoken to Agent Cullen on his behalf. Ward asserts that Cullen denied speaking to his attorney.

Cullen states that until Ward mentioned the name, he had forgotten about Victor Rocco. Cullen does not indicate whether he told AUSA Miller about his recollection. Agent Cullen states that after Ward mentioned Rocco's name, Ward was asked whether he wished to continue to speak with AUSA Miller and Cullen. Ward stated that he would talk to them and the interview continued. On July 26, 1994, the grand jury indicted Barney Ward on charges of conspiracy, wire fraud, mail fraud and obstruction of justice.

### DISCUSSION

The Supreme Court has recognized, albeit in a different context, that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 1697–98, 100 L.Ed.2d 140 (1988) (granting district courts substantial latitude in resolving potential conflicts of interest due to multiple representation of defendants in criminal proceedings).

Defendant Ward argues that AUSA Miller orchestrated a clandestine campaign to obtain admissions from Ward despite knowing that Ward was represented by counsel. Ward contends that the 1992 Tapes and the 1994 Statements must be suppressed as a sanction for AUSA Miller's violation of Rule 4.2. The Government has taken the position that (1) the bulk of authority does not support application of Rule 4.2 to pre-indictment investigations, (2) even if Rule 4.2 applies, AUSA Miller did not violate it, and (3) even if AUSA Miller did violate Rule 4.2, suppression of the evidence is not the proper remedy. The precise issues before this Court are (1) whether Rule 4.2 applies to federal prosecutors prior to indictment in the context of non-custodial contacts with represented persons and, if so, (2) whether AUSA Miller violated the Rule in this case such that suppression is the proper remedy.

Before we address these issues, a brief comment on the history and purpose of Rule 4.2 is necessary. Rule 4.2 and its predecessors have existed since 1908 but only recently have defense attorneys urged that the anti-contact rule should apply in criminal proceedings to bar certain contacts by prosecutors. *Grievance Committee for the Southern District of New York v. Simels*, 48 F.3d 640, 647 (2d Cir.1995) (considering application of Rule 4.2 to defense attorney's contact with represented co-defendant). Among the many justifications for such rules is the need to protect "a defendant from the danger of being tricked into giving his case away by opposing counsel's artfully crafted questions." *United States v. Jamil*, 707 F.2d 638, 646 (2d Cir.1983). Notwithstanding this significant policy goal, the *Simels* court concluded that the origin and scope of the anti-contact provision reveal that it is primarily a rule of professional courtesy. In *Simels*, the Second Circuit preceded its careful review of the history of DR 7–104(A)(1) with the following wise admonition: "The conceded power of the federal district courts to supervise the conduct of attorneys should not be used as a means to substantially alter federal criminal law practice." *Simels*, 48 F.3d at 644. With this in mind, we proceed to analyze Ward's arguments.

■ Defendant Ward places tremendous reliance on an earlier Second Circuit case, *United States v. Hammad,* 858 F.2d 834 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). As far as this Court's research discloses, *Hammad* represents one of the only opinions finding that a prosecutor had violated DR 7–104(A)(1), predecessor of Rule 4.2. *See also Simels,* 48 F.3d at 649 ("It is significant that since *Hammad,* neither this Court nor any reported district court decision considering an alleged violation of DR 7–104(A)(1) has found that the Rule had been violated.") Even in the *Hammad* opinion upon which Ward relies, the Second Circuit refused to suppress the evidence obtained through that violation.

Since *Hammad* appears to be the only major opinion finding a violation, a brief review of the Second Circuit's holding in that case is in order. In *Hammad,* the prosecutor issued a subpoena to an informant, "not to secure his attendance before the grand jury, but to create a pretense that might help the informant elicit admissions from a represented suspect." 858 F.2d at 840. Although both Rule 4.2 and its predecessor DR 7–104(A)(1) apply only to attorneys, the Second Circuit reasoned that the prosecutor's use of a sham subpoena rendered the informant the prosecutor's alter ego. *Id.* As a result, the Second Circuit found the communications prohibited under the Rule.

Before reaching this conclusion, however, the *Hammad* court considered the close question of whether and to what extent DR 7–104(A)(1) applies in the investigatory stages of a criminal prosecution. The Government argued, as it does here, that the anti-contact rule is coextensive with the Sixth Amendment and thus is not effective until initiation of formal adversary proceedings—preliminary hearing, indictment, information or arraignment. Several courts before and after *Hammad* have adopted this view. *See, e.g., United States v. Powe,* 9 F.3d 68, 69 (9th Cir.1993); *United States v. Ryans,* 903 F.2d 731, 740 (10th Cir.), *cert. denied,* 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990); *United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986); *United States v. Fitterer,* 710 F.2d 1328, 1333 (8th Cir.), *cert. denied,* 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983); *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Infelise,* 773 F.Supp. 93, 94–95 (N.D.Ill.1991) (Williams, J.).[2]

■ These courts typically base their holdings on two major themes. First, the courts quite correctly foresee the potentially drastic impact of a broad application of Rule 4.2 on legitimate and necessary tactics involved in the investigation of crime. *See, e.g., Ryans,* 903 F.2d at 739. Second, the courts often interpret the use of the term "party" in DR 7–104(A)(1) to require formal adversary proceedings before the rule applies.[3] *Id.*

In keeping with these restrictive interpretations of DR 7–104(A)(1), the commentary to ABA Model Rule 4.2 explains that:

[C]ommunications with represented criminal suspects prior to initiation of formal judicial proceedings as part of a noncustodial investigation by government agents or with informants generally are not considered subject to the anticontact rule. The rationale is usually that the rule is coextensive with the accused's Sixth Amendment right to counsel, and that the contact is within the "authorized by law" exception.

Annotated Model Rules of Professional Conduct Rule 4.2 cmt. (1992). Several commentators also have concluded that the anti-con-

---

**2.** The Seventh Circuit, however, has not taken a position on the application of Rule 4.2 or its predecessor to pre-indictment, non-custodial settings. In custodial settings, the Seventh Circuit has suggested that a pre-indictment interview of a suspect in the absence of retained counsel "raise[s] ethical questions" under DR 7–104(A)(1). *United States v. Durham,* 475 F.2d 208, 211 (7th Cir.1973).

**3.** DR 7–104(A)(1) provides that:
(A) During the course of his representation of a client a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized to do so.

tact rule was not intended to apply to the investigatory activities of prosecutors and law enforcement officials. *See* L. Ray Patterson & Thomas B. Metzloff, *Legal Ethics: The Law of Professional Responsibility* 709 (3d ed. 1989) ("Almost surely drafters of the Rule [DR 7–104(A)(1) ] did not contemplate its application to prosecutors."); Bruce A. Green, *A Prosecutor's Communications with Defendants: What are the Limits?*, 24 Crim. L.Bull. 283 (1988) (same); Richard Uviller, *Evidence from the Mind of the Criminal Suspect: A Reconsideration of the Current Rules of Access and Restraint*, 87 Colum.L.Rev. 1137, 1176–83 (1987) (arguing that the anti-contact rule was designed for civil-litigation and its adversarial setting).

A host of questions plagues any attempt to apply Rule 4.2 or its predecessor to prosecutors in the pre-indictment, non-custodial setting present in this case. Who is the prosecutor's client? Is the prosecutor acting as an advocate or merely a supervising investigator? What is the subject of the representation at this stage of a criminal investigation? When does a person become a "party" under the Rule? Is it proper for a court to apply Rule 4.2 when the courts have struggled to craft a delicate balance between the needs of law enforcement and the constitutional protections afforded by the Fifth and Sixth Amendments? What does "authorized by law" mean? No court has offered an extensive analysis of these difficult questions. As will become apparent, this Court need not provide all the answers to resolve Defendant's motion.[4]

In its attempt to address a few of these difficult questions, the *Hammad* court reasoned that the "Constitution defines only the 'minimal historic safeguards' which defendants must receive rather than the outer bounds of those we may afford them." *Hammad*, 858 F.2d at 839 (quoting *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 612–13, 87 L.Ed. 819 (1943)). While acknowledging the potential impact on inves-

tigations of crime, the Second Circuit found nothing on the face of the Rule that constrained its reach to that of the Sixth Amendment right to counsel. *Id.* at 838. The court noted that the Model Code of Professional Responsibility "encompasses the attorney's duty to 'maintain the highest standards of ethical conduct.'" *Id.* at 839. The Second Circuit thus found that the Code "secures protections not contemplated by the Constitution." *Id.* Of course, the dilemma then became to balance these protections with the unique and well-established role of federal prosecutors in the investigation of crime.

In its resolution of this dilemma, the *Hammad* court expressed several limitations on the use of the disciplinary rule. The Second Circuit expressly noted that it "would not interpret the disciplinary rule as precluding undercover investigations." *Hammad*, 858 F.2d at 839. Furthermore, the Second Circuit explained that under DR 7–104(A)(1), "a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *Id.*

The *Hammad* court's holding that DR 7–104(A)(1) applies to pre-indictment, non-custodial contacts with represented persons has not resulted in any further findings of a violation of the rule. Even in the Second Circuit, the courts have generally concluded that the contact was authorized by law as a legitimate investigative technique. *See Simels*, 48 F.3d at 649 (citing cases). In practice, then, the broad exceptions to the rule noted in *Hammad* may operate to swallow the Rule itself except in perhaps the most egregious instances of misconduct. Consequently, the results in the Second Circuit do not differ in practical terms from the result reached in those circuits where the courts have concluded that the "no contact" rule simply was not meant to apply to prosecutors

---

4. If there is be national uniformity in this area, this Court believes it can only come through the Supreme Court's exercise of its rule-making power to craft a uniform rule for federal criminal prosecutions. Of course, as the Second Circuit pointed out in *Simels,* such a rule would be subject to Congressional veto under the Rules Enabling Act. *See Simels,* 48 F.3d at 644 n. 6; 28 U.S.C. § 2074. As this Court well knows, the rule-making process in the area of criminal procedure is a long and difficult one.

in the pre-indictment, non-custodial stage of criminal investigations.

This Court finds itself in substantial agreement with those courts finding that the anti-contact rule was not meant to apply to pre-indictment non-custodial contacts with a represented party. While substantial authority supports this view, we will proceed to analyze Ward's arguments assuming that the Rule does apply. If, operating under this assumption, the Court concludes that suppression is an inappropriate remedy for any asserted violation then we need not answer the more difficult questions presented in by the ambiguous language of Rule 4.2.

Rule 4.2 is not entirely identical to DR 7–104(A)(1) and one can argue that at least one of these differences supports a broader interpretation of Rule 4.2. In that regard, we note that the commentary to Rule 4.2 indicates that the "[t]his rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question." One could read this statement as undermining some aspects of the logic underlying the numerous court holdings finding that the rule does not apply to pre-indictment contacts. As stated above, these decisions have reasoned that formal proceedings must be initiated in order for the predecessor to Rule 4.2 to come into play. This comment calls that assumption into question when Rule 4.2 applies. In addition, this comment weakens the argument that prior to the initiation of formal proceedings, the criminal suspect is not a "party" within the meaning of the Rule. This ambiguity, among others, informs and supports our decision to proceed on the assumption that Rule 4.2 applies.

■ Assuming that Rule 4.2 applies in the pre-indictment, non-custodial setting presented in this case, we must now analyze first whether the facts indicate AUSA Miller's awareness of Ward's represented status and whether the contact at issue falls within the "authorized by law" exception to Rule 4.2. As to the first question, the record does not clearly indicate that AUSA Miller knew

Ward had retained counsel in conjunction with the fraud investigation at the time the 1992 Tapes were made.

Assuming that Miller did know that Ward was represented by counsel at the time of the 1992 Tapes, the Government argues that the undercover taping of Ward in meetings with Valliere falls within the "authorized by law" exception to Rule 4.2. This Court agrees. In reaching this conclusion, this Court finds itself in accord with the cases recognizing that undercover taping of suspects during the investigatory stage of criminal proceedings is precisely the kind of legitimate investigatory tactic that even the *Hammad* court found permissible. *Hammad*, 858 F.2d at 839; *see also United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir.1993). While we need not rule out the possibility that a prosecutor could abuse this tactic in an attempt to interfere with a suspect's relationship with counsel, we do not find any showing of such an attempt in this case with respect to the 1992 Tapes.[5]

■ Next, we consider the 1994 Statements made by Ward upon AUSA Miller's visit to his trailer a few months before Ward's indictment. The Court finds this incident far more troublesome. Rule 4.2 would appear to prohibit AUSA Miller from proceeding with any communication with Ward after he stated that he had an attorney. Given that the stated purpose of this meeting was to confront Ward with the allegedly overwhelming nature of the evidence against him and to discuss his cooperation options, the danger for Ward of uncounseled communication with the Government is readily apparent. Couple this danger with the power of the prosecutor to control the timing of the indictment and the triggering of constitutional protections which would prohibit such contact and the potential for prejudice and abuse of power increases. In contrast to the covert use of informants, the Court finds the balance of competing interests weighs in favor of prohibiting overt contacts with represented parties for the purpose of discussing cooperation with the Government. Assuming

---

5. Upon request of the Court, the Government tendered preliminary transcripts of the challenged taped conversations. Having reviewed those transcripts, the Court finds no suggestion that the Government abused its authority to investigate the matters charged in the indictment.

Rule 4.2 applies, the Court would consider AUSA Miller's contact with Ward in violation of the Rule.

■ Having deemed the contact a violation of the Rule, the Court must consider whether suppression is the proper remedy. The *Hammad* court considered suppression a proper remedy, but left its use to the discretion of the district court. At the time AUSA Miller confronted Ward and to this day, a substantial body of law exists which leads to the conclusion that his conduct was proper. At the very least, no court in this circuit, and few, if any, courts in other jurisdictions had affirmatively ruled that similar conduct violated any ethical prohibition. Considering the unsettled state of law in this area and that Ward voluntarily chose to continue to speak with AUSA Miller and Agent Cullen, the Court finds suppression inappropriate in this case.

■ In reaching this conclusion, we have attempted to evaluate and account for the numerous competing policies that Rule 4.2 seeks to balance. We are also mindful of recent holdings in other areas of the law that suggest that a "federal judge cannot [and should not] punish the prosecutor at the expense of the law-abiding public." *United States v. Van Engel,* 15 F.3d 623, 632 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994). In keeping with this view and the admonition of the *Simels* court, we find it best to maintain a narrow reading and cautious approach to Rule 4.2.

■ Rule 4.2, or a substantially similar provision, is a widely accepted ethical limitation on communications with represented parties found in almost all jurisdictions. Nonetheless, its impact on federal prosecutors remains unclear. If the Rule is to operate with any force and if it is to offer any guidance to federal prosecutors, a uniform standard is necessary. Notwithstanding this need, this Court cannot rewrite the Rule to provide the clarity and uniformity that is currently absent.

While on the subject of uniformity, the Court notes that the Department of Justice has promulgated a regulation covering the subject of communication with represented parties. *See* 28 C.F.R. pt. 77; 59 Fed.Reg. 39,910 (1994). While this regulation represents a moderation of the views expressed by then Attorney General Thornburgh in his infamous memorandum, it still contains broad statements regarding the power of the Justice Department to set ethical standards for its attorneys and to exempt them from application of contrary standards. The regulation also indicates that the Department generally will serve as the disciplinary body and gives notice of the Department's intent to displace state and federal rules of ethical conduct. The regulation does not apply to the conduct in this case because it had not yet taken effect, but we do find a few points noteworthy.[6]

Setting aside the debate about the impact of this regulation and the authority of the Justice Department to enact it, this regulation would appear to prohibit AUSA Miller from communicating with Ward as he did in this case. Specifically, the commentary to the final rule notes that the Department has settled on a general policy (embodied in changes to the United States Attorneys' Manual) of prohibiting overt contacts with represented targets of criminal investigations. *See* 59 Fed.Reg. 39927–28. The regulation itself states that:

> An attorney for the government may not initiate or engage in negotiations of a plea agreement, settlement, statutory or nonstatutory immunity agreement, or other disposition of actual or potential criminal charges . . ., or sentences or penalties with a represented person . . . who the attorney for the government knows is represented

---

6. For more recent discussion of the conflicts inherent in the anti-contact rule and divergent opinions of courts and commentators, see Amy R. Mashburn, *A Clockwork Orange Approach to Legal Ethics: A Conflicts Perspective on the Regulation of Lawyers by Federal Courts,* 8 Geo. J. Legal Ethics 473 (1995); Neals–Erik William Delker, *Ethics and the Federal Prosecutor: The Continuing Conflict over the Application of Model Rule 4.2 to Federal Attorneys,* 44 Am.U.L.Rev. 855 (1995); Roger C. Cramton & Kisa K. Udell, *State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti–Contact and Subpoena Rules,* 53 U.Pitt.L.Rev. 291 (1992).

by an attorney without the consent of the attorney representing such person....

28 C.F.R. § 77.8. While one can engage in word-play to argue that a discussion of cooperation options does not fit precisely within this provision, it is apparent to the Court that the policies underlying Rule 4.2 and this new regulation would counsel against AUSA Miller's contact with Ward as it occurred in this case.

In the absence of Seventh Circuit authority on this issue, this Court is confronted with an impressive number of opinions persuasively reasoning that Rule 4.2's substantially identical predecessor does not and should not apply to pre-indictment, non-custodial contacts by prosecutors or undercover informants. As we have noted, those opinions are not entirely satisfactory but we cannot ignore them. In light of this substantial body of authority, the limited authority supporting Defendant's position is insufficient to cause the Court to hold affirmatively that Rule 4.2 does apply to such contacts. In any event, assuming the Rule does apply in this case, the Court would not find suppression warranted. Accordingly, Defendant's motion to suppress the 1992 Tapes and the 1994 Statements is denied.

### CONCLUSION

For the reasons set forth above, the Court denies Defendant Ward's motion to suppress.